1  Nina Huerta (SBN 229070)
   nhuerta@lockelord.com
2  Locke Lord LLP
   300 South Grand Avenue, Suite 2600
3  Los Angeles, CA 90071
   Tel:  (213) 485-1500
4  Fax:  (213) 485-1200

5
   Jennifer A. Kenedy (*pro hac vice* application pending)
6  jkenedy@lockelord.com
   Locke Lord LLP
7  111 South Wacker Drive
   Chicago, IL 60606
8  Tel:  (312) 443-0700
   Fax:  (312) 443-0336
9

10 Attorneys for Plaintiff
   FIDELITY BROKERAGE SERVICES LLC

11

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14 FIDELITY BROKERAGE                CASE NO. SACV13-0573 AG(ANx)
   SERVICES LLC,
15                                   **FIDELITY BROKERAGE SERVICES
                                     LLC's MEMORANDUM OF POINTS
16           Plaintiff,              AND AUTHORITIES IN SUPPORT OF
                                     ITS *EX PARTE* APPLICATION FOR
17      v.                           TEMPORARY RESTRAINING ORDER
                                     (WITHOUT SECURITY) AND ORDER
18 DEAN HEIMBACH,                    TO SHOW CAUSE RE PRELIMINARY
                                     INJUNCTION PURSUANT TO
19           Defendant.             FEDERAL RULE OF CIVIL
                                     PROCEDURE 65 AND LOCAL RULE 7-
20                                   19

21
                                     [*Ex Parte* Application, [Proposed] Order;
22                                   Declarations of Linda Park, Buddy Maclean,
                                     Eric Bronner, Michael MacDonald, and Leslie
23                                   Blickenstaff; *Ex Parte* Request to File Under
                                     Seal; and *Ex Parte* Motion for Leave to File
24                                   Oversize Brief filed concurrently herewith]

25
                                     Date:  *Ex Parte*
26                                   Time: *Ex parte*
                                     Place: TBD
27 ORIGINAL
                                     Complaint Filed: April 10, 2013
28
   ─────────────────────────────────────────────
                          1



# **TABLE OF CONTENTS**

**Page No(s)**

INTRODUCTION ............................................................... 1

STATEMENT OF FACTS ................................................... 2

    A.    FIDELITY CREATES AND MAINTAINS ITS CUSTOMER
        RELATIONSHIPS ................................................... 2

    B.    FIDELITY DERIVES SIGNIFICANT VALUE FROM
        ITS TRADE SECRET CUSTOMER DATA ...................... 4

    C.    FIDELITY TAKES REASONABLE STEPS TO
        PRESERVE THE CONFIDENTIALITY OF ITS
        CUSTOMER DATA ................................................. 5

    D.    HEIMBACH AGREED TO PRESERVE THE
        CONFIDENTIALITY OF FIDELITY'S TRADE SECRET
        CUSTOMER DATA BY EXECUTING NON-DISCLOSURE
        AND NON-SOLICITATION AGREEMENTS ..................... 5

    E.    HEIMBACH WAS REMINDED WHEN HE RESIGNED
        OF HIS OBLIGATIONS NOT TO SOLICIT FIDELITY
        CUSTOMERS AND TO PRESERVE THE
        CONFIDENTIALITY OF FIDELITY'S TRADE SECRET
        CUSTOMER DATA, AND HEIMBACH ASSURED
        FIDELITY THAT HE WOULD ABIDE BY HIS
        OBLIGATIONS ...................................................... 7

    F.    HEIMBACH'S REPRESENTATIONS WERE NOT
        TRUE: HEIMBACH HAS MISAPPROPRIATED
        FIDELITY'S TRADE SECRET CUSTOMER DATA AND
        SOLICITED FIDELITY CUSTOMERS AND WILL
        CONTINUE TO DO SO UNLESS ENJOINED ..................... 7

        1.    Heimbach Immediately Sent Mailings To Fidelity's
            Customers ................................................... 8

        2.    Fidelity's Good Faith Efforts To Resolve This Situation
            Without Court Intervention Have Failed As A Result Of
            Heimbach's Apparent False Statements In His Affidavit ..... 8

    G.    FIDELITY FACES A THREAT OF IMMEDIATE AND
        IRREPARABLE HARM FROM HEIMBACH'S CONDUCT ...... 14

LEGAL ARGUMENT ...................................................... 15

I.    THE STANDARDS FOR GRANTING TEMPORARY INJUNCTIVE
    RELIEF STRONGLY FAVOR GRANTING FIDELITY RELIEF
    IN THIS CASE .............................................................. 17

i

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

II.    FIDELITY IS LIKELY TO SUCCEED ON THE MERITS OF
       ITS CLAIMS ................................................................    18

       A.   HEIMBACH IMSAPPROPRIATED FIDELITY'S TRADE
            SECRET CUSTOMER INFORMATION IN VIOLATION
            OF THE UTSA ......................................................    18

            1.   Fidelity's Customer Information Is A Trade Secret
                 Under The UTSA ..........................................    20

            2.   Heimbach Misappropriated Fidelity's Trade Secret
                 Customer Information ....................................    24

            3.   Heimbach Did More Than Announce; After Denying
                 Any Solicitation He Solicited A Customer By Phone
                 And In His Home Using Fidelity Account Information ......    25

       B.   FIDELITY WILL PREVAIL ON ITS BREACH OF
            CONTRACT CLAIM .................................................    28

       C.   FIDELITY WILL PREVAIL ON ITS CLAIM FOR BREACH
            OF THE DUTY OF LOYALTY ......................................    29

III.   FIDELITY IS SUFFERING IRREPARABLE HARM AS A RESULT
       OF HEIMBACH'S WRONGFUL AND ONGOING ACTS ..............    30

IV.    THE EQUITIES AND THE PUBLIC INTEREST STRONGLY
       FAVOR GRANTING THE REQUESTED INJUNCTIVE RELIEF .......    32

       A.   THE BALANCE OF EQUITIES TIPS STRONGLY IN
            FAVOR OF FIDELITY ..............................................    32

       B.   THE PUBLIC INTEREST WILL BE SERVED BY
            GRANTING INJUNCTIVE RELIEF ...............................    33

V.     A TEMPORARY RESTRAINING ORDER WILL MAINTAIN
       THE *STATUS QUO* PENDING ARBITRATION .........................    34

VI.    THIS COURT MAY ENTER INJUNCTIVE RELIEF EVEN
       THOUGH THE MERITS WILL BE DECIDED IN ARBITRATION .....    35

VII.   THERE IS NO NEED FOR A BOND ........................................    36

CONCLUSION ...........................................................................    37

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3   **<u>Federal Cases</u>**

4   *Am. Trucking Ass'ns v. City of Los Angeles,*
        559 F.3d 1046 (9th Cir. 2009) ........................................................ 18
5

6   *Blumenthal v. Merrill Lynch,*
        910 F.2d 1049 (2d Cir. 1990) ........................................................ 35
7

8   *Cruz v. Washington Mut. Bank,*
        2011 U.S. Dist. LEXIS 25439 (S.D. Cal., Mar. 14, 2011) .................. 17
9

10   *Earth Tech. Corp. v. Envt.l Research & Tech., Inc.,*
        1984 WL 877 (C.D. Cal. 1983) ...................................................... 15

11   *Fidelity Brokerage Serv. LLC v. Sanchez,*
        Case No. 08-03863 (C.D. Cal. 2008) ............................................. 17
12

13   *Fidelity Brokerage Serv. v. Downey,*
        Case No. 08-1637 (JFB) (E.D.N.Y. April 28, 2008) ........................... 17
14

15   *Fidelity Brokerage Serv. v. Johnson,*
        Case No. A04-CA-662-SS (W.D. Tex. 2004) .................................... 17
16

17   *Fidelity Brokerage Serv. v. Jones,*
        Case. No. 04-3478 (S.D. Tex. 2004) .............................................. 17
18

19   *Fidelity Brokerage Serv. v. Parker,*
        Case No. 04- 1027 (S.D. Cal. 2004) .............................................. 17
20

21   *Fidelity Brokerage Serv. v. Rousseaux,*
        Case No. 03- 01319 (D. Md. 2003) ................................................ 16
22

23   *Fidelity Brokerage Serv. v. Rupp,*
        Case No. 05- 00083 (D.N.H. 2005) ................................................ 17
24

25   *Fidelity Brokerage Serv. v. Umstead,*
        Case No. 07-347 (E.D. Va. 2007) .................................................. 17
26

27   *Fidelity Brokerage Serv. v. Vance,*
        Case No. 07-1230 (C.D. Cal. 2007) ............................................... 17

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

iii

*Fidelity Global Brokerage Group v. Gray,*
   Case No. 10-1255 (E.D. Va. Nov. 9, 2010) ........................................................ 16

*Fidelity v. McNamara,*
   No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011)......................passim

*FMC Corp. v. Varco, Inc.,*
   677 F.2d 500 (5th Cir. 1982)................................................................................. 19

*Gable-Leigh, Inc. v. N. Am. Miss,*
   No. 01-01019, 2001 WL 521695 (C.D. Cal. Apr. 13, 2001) ................. 16, 20, 32

*Gallagher Benefit Servs., Inc. v. De La Torre,*
   283 Fed.Appx. 543 (9th Cir. 2008) ........................................................ 20, 31, 32

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.,*
   556 F.Supp.2d 1122 (E.D. Cal. 2008) ............................................................ 19, 29

*IMI-Tech Co. v. Gaaliani,*
   691 F. Supp. 214 (S.D. Cal. 1986) ................................................................. 22, 30

*Jorgensen v. Cassiday,*
   320 F.3d 906 (9th Cir. 2003) ................................................................................ 36

*MAI Sys. Corp. v. Peak Computer, Inc.,*
   991 F.2d 511 (9th Cir. 1993).................................................................. 21, 26, 28

*Merrill Lynch v. Chung,*
   No. 01-659, 2001 WL 283083 (C.D. Cal. Feb. 2, 2001)............................passim

*Merrill Lynch v. Dutton,*
   844 F.2d 726 (10th Cir. 1988).............................................................................. 35

*Merrill Lynch v. Garcia,*
   127 F. Supp. 2d 1305 (C.D. Cal. 2000)...........................................................passim

*Merrill Lynch v. Hegarty,*
   808 F. Supp 1555 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) (per
   curiam)................................................................................................................... 35

*Merrill Lynch v. Salvano,*
   999 F.2d 211 (7th Cir. 1993)................................................................... 18, 19, 35

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

*Merrill Lynch v. Stidham,*
    658 F.2d 1098 (5th Cir. 1981).............................................................30

*Merrill Lynch v. Zimmerman,*
    No. 96-2412, 1996 WL 707107 (D. Kan. Oct. 1, 1996) ....................32

*Ortho Pharm. Corp. v. Amgen Inc.,*
    887 F.2d 460 (3d Cir. 1989)...............................................................35

*Peabody Coalsales v. Tampa Electric,*
    36 F.3d 46 (8th Cir. 1994).................................................................35

*Performance Unlimited v. Questar Pub.,*
    52 F.3d 1373 (6th Cir. 1995)..............................................................35

*PMS Dist. Co. v. Huber,*
    863 F.2d 639 (9th Cir. 1988)..............................................................35

*Pyro Spectaculars North, Inc. v. Souza,*
    861 F.Supp.2d 1079 (E.D. Cal. 2012)...........................................passim

*Ruscitto v. Merrill Lynch,*
    777 F.Supp. 1349, *aff'd,* 948 F.2d 1286 (5th Cir. 1991)..............34, 35

*Sana v. Hawaiian Cruises, Ltd.,*
    181 F.3d 1041 (9th Cir. 1999)............................................................10

*Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co.,*
    240 F.3d 832 (9th Cir. 2001)..............................................................31

*Teradyne Inc. v. Mostek Corp.,*
    797 F.2d 43 (1st Cir. 1986) ...............................................................35

*Toyo Tire Holdings of Am., Inc. v. Continental Tire of N. Am.,*
    609 F.3d 975 (9th. Cir. 2010)........................................................17, 18

*Walczak v. EPL Prolong, Inc.,*
    198 F.3d 725 (9th Cir. 1999)..............................................................36

**State Cases**

*Aetna Building Maint. Co., Inc. v. West,*
    39 Cal.2d 198 (Cal. 1952) ............................................................25, 26

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

v

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

*Am. Credit Indem. Co. v. Sacks,*
   213 Cal.App.3d 622 (1989) ..................................................................... 21, 22, 26

*Cereva Networks, Inc. v. Lieto,*
   2001 WL 1228040 (Mass. Super. 2001) ........................................... 28

*Courtesy Temporary Service v. Camacho,*
   222 Cal.App.3d 1278 (1990) ......................................................... 21, 23

*Darwin Partners, Inc. v. Signature Consultants, LLC,*
   2000 WL 33159238 (Mass. Super. 2000) ....................................... 28

*Fidelity Brokerage Serv. LLC v. Fassenfeld,*
   Case No. 013945/11 (NY Sup. Ct. Sept. 28, 2011)........................... 16

*Fidelity Brokerage Serv. LLC v. Franz,*
   Case No. 8/9564 (NY Sup. Ct. May 7, 2008) .................................. 17

*Fidelity Brokerage Serv. LLC v. Wilder,*
   Case No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011) ...................... 16

*Fidelity Brokerage Serv. v. Alexopoulos,*
   Case No. 03-5362 (Mass. Super. Ct. 2003)....................................... 16

*Fidelity Brokerage Serv. v. Donovan,*
   Case. No. 03-2286 (Mass Super. Ct. 2003) ..................................... 16

*Fidelity Brokerage Serv. v. Stockwell,*
   Case No. 05-0455 (Mass. Super. Ct. 2005)....................................... 17

*Fidelity Global Brokerage Group v. Beatty,*
   Case No. 652147 (NY Sup. Ct. Dec. 6, 2010) ................................ 16

*Fidelity v. Wilder,*
   No. Case No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011) ................ 29

*Fortune Personnel Consultants v. Hagopian,*
   1997 WL 796494 (Mass. Super. 1997) ........................................... 28

*Huong Que, Inc. v. Mui LUU,*
   150 Cal.App.4th 400 (2007).............................................................. 29

*Klamath-Orleans Lumber, Inc. v. Miller,*
   87 Cal.App.3d 458 (1978) ............................................... 16, 20, 23, 32

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

*Kroeger v. Stop & Shop Co., Inc.,*
   432 N.E.2d 566 (Mass. Ct. App. 1982) ................................................. 28

*Morlife, Inc. v. Perry,*
   56 Cal.App.4th 1514 (1997) ............................................. 16, 20, 32, 34

*ReadyLink Healthcare v. Cotton,*
   126 Cal.App.4th 1006 (2005) ......................................... 16, 20, 23, 32

*Reeves v. Hanlon,*
   33 Cal.4th 1140 (2004) ........................................................ 19, 26

*Stone Legal Res. Group, Inc. v. Glebus,*
   2003 WL 914994 (Mass. Super. 2003) ................................................ 28

**Federal Statutes**

15 U.S.C. §§ 6801, *et. seq.* ............................................................. 5

15 U.S.C. § 6801(a) ..................................................................... 22

**State Statutes**

Cal. Civ. Code § 3426 ................................................................... 20

Cal. Civ. Code § 3426.1(b) .............................................................. 24

Cal. Civ. Code § 3426.2(a), (c) ........................................................ 16

Cal. Civ. Code § 3426.2(b)(2) .......................................................... 24

Cal. Civ. Code § 3426.2(d) ............................................................. 19

UTSA ............................................................................... passim

**Federal Rules**

Federal Rule of Civil Procedure 65 ..................................................... 1

Federal Rule of Civil Procedure 65(c) ................................................. 36

Federal Rule of Evidence 803(6) ....................................................... 10

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1

**State Rules**

2

Rules 65-1 and 7-19 ................................................................................................ 1

3

Rule 13804(a)(2) ..................................................................................................... 2

4

**Federal Regulations**

5

6

17 C.F.R. §§ 248.1, *et. seq.*................................................................................... 5

7

17 C.F.R. § 248.3(t)(1) .......................................................................................... 22

8

17 C.F.R. § 248.3(u)(1) ......................................................................................... 22

9

17 C.F.R. § 248.3(u)(2)(i)(D) ................................................................................ 22

10

17 C.F.R. § 248.10 ................................................................................................. 22

11

**Other Authorities**

12

13

Financial Industry Regulatory Authority Rule 13200 ............................................. 2

14

Financial Industry Regulatory Authority Rule 13804 ....................................... 2, 36

15

www.whitepages.com ............................................................................................ 11

16

17

18

19

20

21

22

23

24

25

26

27

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

# INTRODUCTION

Defendant Dean Heimbach ("Heimbach"), a former Fidelity Account Executive, has taken Fidelity's confidential and trade secret customer information that he had access to by virtue of his employment with Fidelity, and is using that information to unlawfully solicit Fidelity customers to transfer their business to him at his new financial services firm, competing brokerage institution LPL Financial, LLC ("LPL"). Plaintiff Fidelity Brokerage Services LLC ("Fidelity") respectfully applies *ex parte* to this Court for the entry of an immediate temporary restraining order ("TRO") (without security) against Heimbach pursuant to Federal Rule of Civil Procedure 65 and Local Rules 65-1 and 7-19, and asks the court to issue an Order to Show Cause ("OSC") why a Preliminary Injunction should not be granted.

Fidelity has done all it reasonably could do to avoid court intervention in this matter. When Fidelity first heard reports that Heimbach may have misappropriated Fidelity customer information it immediately sent a cease and desist letter to Heimbach. Fidelity began a dialogue with LPL and, through LPL, Heimbach indicated he had only sent out announcements of his new employment to Fidelity customers. Given that those announcements were complete and he had no further legally permissible reason to possess Fidelity's trade secret customer information, Heimbach signed an affidavit in late January, 2013. In the affidavit, Heimbach attested that he would abide by his contractual obligations and returned all Fidelity customer information in his possession. Fidelity considered the matter closed.

Unfortunately, Fidelity has recently received a report demonstrably showing that Heimbach's representations to LPL and Fidelity counsel about the nature of the information in his possession as well as the nature of his communications with Fidelity customers were untrue. On March 13, 2013 a Fidelity customer called because Heimbach recently called him, solicited his business, held a meeting in the customer's house to discuss the transfer of that customer's accounts, and showed up with account forms with the customer's personal and Fidelity account information

1

1  already filled in.  This customer called because he was concerned that Heimbach had

2  his personal and Fidelity account information  Heimbach had never returned any

3  Fidelity customer account information and denied having any.

4       Fidelity and Heimbach are subject to the arbitration rules and regulations of the

5  Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200.

6  Accordingly, concurrently with the filing of this *Ex Parte* Application for TRO

7  ("Application"), Fidelity also is filing a Statement of Claim with FINRA seeking

8  binding arbitration of this dispute pursuant to Rule 13804(a)(2).  Although the merits

9  of this case will likely be resolved in arbitration before FINRA, pursuant to FINRA

10  Rule 13804, Fidelity is ***required*** to seek and ***obtain*** immediate injunctive relief in a

11  court of competent jurisdiction ***before*** an expedited FINRA arbitration is permitted to

12  proceed. Once the TRO is issued by this Court, an expedited arbitration will be

13  scheduled with FINRA within fifteen (15) days of the entry of the TRO.  If no TRO is

14  issued, however, this case cannot be heard by FINRA on an expedited basis and,

15  instead, will be assigned to a standard-track arbitration, which would delay a hearing

16  on the merits for a year or more.  Immediate injunctive relief is therefore needed to

17  preserve the *status quo* until an expedited arbitration hearing before FINRA can occur.

18  <div align="center">**STATEMENT OF FACTS**</div>

19      **A.**    **Fidelity Creates And Maintains Its Customer Relationships.**

20       Fidelity and its affiliates provide a variety of financial services—such as

21  retirement services, investment planning, wealth management, securities execution

22  and clearing, life insurance services, and equity services—to Fidelity customers, with

23  whom Fidelity typically enjoys significant, long-term relationships.  (Declaration of

24  Buddy Maclean ("Maclean Decl."), ¶ 2.)  Fidelity offers individual investors a broad

25  assortment of trading and cash management features including buying and selling

26  stocks, bonds, options and more than 5,100 mutual funds from Fidelity and other well-

27  known fund companies.  (*Id.*)  Critically, Fidelity is unique in the retail brokerage

28  field because Fidelity does not have its Account Executives make "cold calls" to

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    persons who have no relationship with Fidelity, or who were not referred to Fidelity.

2    (*Id.* at ¶ 3.) Fidelity requires its Account Executives to develop service relationships

3    based upon leads that Fidelity provides. (*Id.*) Fidelity provides leads to its Account

4    Executives from two primary sources. (*Id.*)

5         First, Fidelity forwards information to its representatives from prospective

6    customers who initiate contact with Fidelity either by telephone, over the internet, or

7    in person. (*Id.* at ¶ 4.) Fidelity and its affiliates devote tens of millions of dollars per

8    year toward attracting customers to Fidelity's various businesses in a variety of

9    means. (*Id.*) Fidelity arranges to publish and broadcast national and local

10   advertisements which invite potential customers to contact Fidelity; Fidelity maintains

11   an interactive internet page that allows interested persons to establish relationships

12   with Fidelity; Fidelity maintains multiple call centers that prospective customers can

13   use to initiate contact with Fidelity; and, Fidelity maintains prominent retail locations

14   which prospective customers can visit. (*Id.*) A large portion of Fidelity's business is

15   derived from this initial customer contact that is generated by significant investments

16   of time, labor, and capital by Fidelity. (*Id.*)

17        Second, Fidelity forwards information to its representatives regarding

18   customers, with whom Fidelity already has a relationship, when those customers

19   experience "triggering events," such as Fidelity 401(k) distributable events, which

20   may lead to interest in Fidelity's retail financial services. (*Id.* at ¶ 5.) In addition,

21   representatives may be assigned to service customers previously serviced by other

22   representatives in certain circumstances, such as if the former representative moves,

23   leaves Fidelity, or is promoted to another position. (*Id.*) A significant portion of

24   Fidelity's business is derived from servicing the needs of Fidelity's existing

25   customers. (*Id.*) Fidelity's lead-based approach to supporting its Account Executives

26   distinguishes Fidelity from other full-service brokerages, where individual brokers,

27   rather than the firm, are responsible for establishing customer relationships. (*Id.*)

28   Fidelity's success in its lead-based approach is based on the typically long-standing

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  relationships it enjoys with its customers.  (*Id.*)

2  **B.  Fidelity Derives Significant Value From Its Trade Secret Customer**
3  **Data.**

4  Fidelity's success with its unique lead-based approach to supporting Account
5  Executives, such as Heimbach, is directly tied to Fidelity's trade secret customer
6  information, which is among Fidelity's most important assets.  (*Id.* at ¶ 6.)  Fidelity's
7  trade secret customer data includes the names of and contact information for Fidelity
8  customers, and includes financial information relating to those customers, such as
9  customer financial statements, investment goals, investment history, assets, income,
10  and net worth.  (*Id.*)  Although certain information might be publicly available—such
11  as an individual's name or published home telephone numbers—only a limited
12  number of Fidelity employees know who among the general public are Fidelity
13  customers, and therefore have a specific need for investment services.  (*Id.*)  Fidelity
14  developed its customer data through a significant investment of time, labor, and
15  capital, as described above.  (*Id.*)

16  Fidelity maintains its customer data in confidence, both to preserve Fidelity's
17  competitive advantage in its customer base and to meet customer expectations that
18  Fidelity will maintain sensitive, personally identifiable information (including their
19  identity as a customer, contact information and financial information) in confidence.
20  (*Id.* at ¶ 7.)  Fidelity derives substantial economic value from preserving its customer
21  data as a trade secret.  (*Id.*)  Although individual customers are periodically subject to
22  random solicitations from Fidelity competitors, no competitor can effectively target a
23  set of Fidelity customers and address their needs without access to Fidelity's trade
24  secret customer data.  (*Id.*)  In this way, maintaining the confidentiality of Fidelity's
25  trade secret customer data provides Fidelity with a significant competitive advantage
26  over its competitors.  (*Id.*)

27  ///

28  ///

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

4

C.    **Fidelity Takes Reasonable Steps To Preserve The ConfidentialityOf Its Customer Data.**

Fidelity vigilantly preserves its trade-secret customer data so that it does not become available to competitors, who could use the data to divert customers without the investment of time, labor, and capital that Fidelity made to compile the information. (*Id.* at ¶ 8.)  Fidelity does not provide its trade secret customer data to competitors. (*Id.*)  Fidelity maintains its trade secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access. (*Id.*)  Fidelity maintains a Confidentiality Policy, educates its employees on the policy and requires employees, including Heimbach, to sign Employee Agreements in which each employee agrees not to use or disclose Fidelity Confidential Information, including Fidelity customer information, outside of Fidelity. (*Id.*)

Additionally, Fidelity has been vigilant in protecting its customers' privacy, because most Fidelity customers have not authorized Fidelity to share their contact or financial information outside of Fidelity.  Furthermore, Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information, including contact information and financial information.  *See* 15 U.S.C. §§ 6801, *et. seq.*; 17 C.F.R. §§ 248.1, *et. seq.*

D.    **Heimbach Agreed To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Data By Executing Non-Disclosure and Non-Solicitation Agreements.**

Although Fidelity provides access to its Confidential Information to a limited number of employees, Fidelity maintains, and advises its employees of, a Confidentiality Policy that is displayed on Fidelity's intranet and periodically reminds its employees of this policy.  (Declaration of Linda Park ("Park Decl.") ¶ 7.)  Fidelity also preserves confidential and trade secret customer data by requiring each employee to execute a standard Fidelity Employee Agreement.  (*Id.* at ¶ 8.)  On June 18, 2010,

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1 at the inception of his employment, Heimbach signed an Employee Agreement as a

2 condition of his employment with Fidelity, which Fidelity requires of all its financial

3 representatives. (*Id.*)

4     In the Employee Agreement, Heimbach acknowledged the confidentiality of

5 Fidelity's records, including particularly Fidelity's customer lists and customer

6 information. (*Id.* at Ex. 2.) Heimbach also promised to use Fidelity's Confidential

7 Information only in the course of his employment with Fidelity and not to divulge

8 Fidelity's Confidential Information to third parties. (*Id.*) Moreover, Heimbach agreed

9 to refrain from soliciting Fidelity customers during, and for one year after the

10 termination of, his employment with Fidelity. (*Id.*) Importantly, Heimbach also and

11 further agreed that any violation of the Employee Agreement would cause Fidelity

12 irreparable damage and would entitle Fidelity to seek emergency injunctive relief to

13 protect its Confidential Information. (*Id.*)

14     As consideration for the Employee Agreement Heimbach executed, Fidelity

15 hired and continued to employ him, compensated him throughout his employment,

16 and provided him with introductory and continuing on-the-job training. (*Id.* at ¶ 9.)

17 Fidelity assigned Heimbach a list of Fidelity customers to service on behalf of Fidelity

18 and provided Heimbach with the above-described leads to enable him to succeed at

19 Fidelity. (*Id.*) Fidelity further provided Heimbach with support services; paid for

20 facilities, computer equipment, market reporting services, and all other business

21 expenses; and registered Heimbach with the New York Stock Exchange, National

22 Association of Securities Dealers (n/k/a FINRA), and the American Stock Exchange.

23 (*Id.*) Fidelity provided Heimbach with sales assistance, research, the benefit of

24 Fidelity advertising, goodwill and name recognition, access and use of experts in asset

25 management, tax, estate planning and insurance, and with promotional marketing and

26 sales support. (*Id.*)

27     At the time of his departure, Heimbach was an Account Executive at the Brea

28 investor center. (*Id.* at ¶ 5; Declaration of Leslie Blickenstaff ("Blickenstaff Decl."),

**Locke Lord LLP**
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

6

at ¶ 3.)  As an Account Executive, Heimbach was assigned a list of customers to service on behalf of Fidelity.  (Park Decl. at ¶ 6.)  In order for Heimbach to service these accounts, he required and was given access to their confidential personal, financial, and account information.  (*Id.*)  Heimbach's assigned list was comprised of approximately 411 households, representing approximately $290 million in assets under Fidelity management.  (*Id.*)

**E.      Heimbach Was Reminded When He Resigned Of His Obligations Not To Solicit Fidelity Customers And To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Data, And Heimbach Assured Fidelity That He Would Abide By His Obligations.**

Heimbach resigned from Fidelity at 3:56 p.m. on Thursday, December 13, 2012.  (*Id.* at ¶ 10.)  When Heimbach resigned, his branch office manager Ms. Linda Park reminded him of his contractual obligations to Fidelity and specifically advised him that Fidelity confidential customer information may not be used when he leaves Fidelity.  (*Id.*)  When Ms. Park reminded him of this, as well as of his non-solicitation obligations, Heimbach told Ms. Park that he would not solicit clients and would abide by his contractual obligations.  (*Id.*)

**F.      Heimbach's Representations Were Not True: Heimbach Has Misappropriated Fidelity's Trade Secret Customer Data And Solicited Fidelity Customers And Will Continue To Do So Unless Enjoined.**

Shortly after Heimbach resigned, Fidelity learned that he was immediately starting employment as an Investment Executive with Capstone, a financial services firm located in Newport Beach, California which offers brokerage services through LPL, a national brokerage firm.  (*Id.* at ¶ 5.)  Both Capstone and LPL compete with Fidelity in offering investment planning, wealth management, and other financial services to customers. (*Id.*)

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

7

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1.    Heimbach Immediately Sent Mailings To Fidelity's Customers.

Soon after Heimbach resigned from Fidelity and joined Capstone and LPL, Fidelity received reports that Fidelity customers received letters from Heimbach regarding his new position with LPL. (*Id.* at ¶ 5; Blickenstaff Decl. at ¶ 4.) The only way Heimbach could have had knowledge of these customers and their contact information is by using confidential and trade secret information that he misappropriated from Fidelity during his employment. (Blickenstaff Decl. at ¶ 5.) The reports flowing in from Fidelity's customers, therefore, strongly suggested that Heimbach had in his possession and was using Fidelity's confidential and trade secret customer information on behalf of his new employer, LPL. (*Id.*)

2.    Fidelity's Good Faith Efforts To Resolve This Situation Without Court Intervention Have Failed As A Result Of Heimbach's Apparent False Statements In His Affidavit.

After learning of these customer reports, Fidelity sent a letter to Heimbach on January 4, 2013 indicating that Fidelity had reason to believe he was contacting and soliciting Fidelity customers, and asking that he cease and desist from this conduct immediately. (*Id.* at ¶ 7.) Fidelity also reminded him that, pursuant to his Employee Agreement, he was and is not permitted to use or disclose Fidelity customer information, including names, addresses, email addresses, telephone numbers and account information (which would include portfolio worth, asset distribution, risk tolerance, and investment strategy and goals). (*Id.*) In addition, Fidelity formally requested that Heimbach return to Fidelity all such confidential and trade secret information in his possession. (*Id.*) Fidelity also asked Heimbach to review and sign an affidavit that stated that he had returned to me and/or did not have any Fidelity customer information. (*Id.*) Fidelity's January 4, 2013 letter was copied to Peter Gillies, Associate Counsel at LPL. (*Id.*) Copies of the Employee Agreement Heimbach signed with Fidelity and the proposed affidavit were enclosed with the letter. (*Id.*)

1    On January 12 and again on January 19, Fidelity also sent Heimbach letters

2    reminding him of his ongoing obligations to Fidelity. (*Id.* at ¶ 8.) These letters also

3    included a copy of Heimbach's Employee Agreement with Fidelity. (*Id.*)

4    Fidelity also reached out to Mr. Gillies about its concerns that Heimbach was

5    soliciting customers and using Fidelity confidential customer information to contact

6    Fidelity customers on behalf of LPL. (*Id.* at ¶ 9). Fidelity informed Mr. Gillies that

7    Fidelity wanted Heimbach to sign an affidavit verifying that (1) Heimbach in fact had

8    no such Fidelity confidential or trade secret information in his possession in any form,

9    and (2) Heimbach had not provided any such information to any third party, including

10   LPL. (*Id.*) In response, Mr. Gillies informed Fidelity that Heimbach had "memorized

11   names" of the customers he worked with while at Fidelity, looked up their contact

12   information on the internet, and then used that information to send a letter to those

13   customers announcing his new job and contact information at LPL. (*Id.*) Mr. Gillies

14   told Fidelity that Heimbach only sent a written announcement of his new employment

15   and was not soliciting Fidelity customers. (*Id.*) Given that Heimbach had already

16   announced his new employment (the only possible legally permissible use of that

17   trade secret information under California law), Mr. Gillies agreed to have Heimbach

18   sign a revised affidavit which indicated he was returning a copy of all customer

19   information in his possession, deleting any remaining copies and attesting that he

20   would honor his contractual obligations to Fidelity. (*Id.*)

21   On February 5, 2013, Fidelity received the affidavit signed by Heimbach on

22   January 24, 2013. (*Id.* ¶ 10 & Ex. 4.) In connection with signing the affidavit,

23   Heimbach returned to Fidelity a list of 89 customers, including their first and last

24   names and addresses (including street, city, state and zip code). (*Id.*) In the sworn

25   affidavit, Heimbach attested that (1) he was returning to Fidelity a copy of all Fidelity

26   customer information he had in his possession and that information was attached to

27   the affidavit; and (2) he would abide by his contractual obligations to Fidelity going

28

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

9

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  forward. (*Id.*)  Given the representations in the sworn affidavit and the return of the

2  customer list, Fidelity considered the matter closed. (*Id.*)

3  To Fidelity's surprise and alarm, Fidelity was troubled to learn that a customer

4  had called Fidelity's internal complaint line – an anonymous line typically used by

5  Fidelity employees – on March 13, 2013, to express a concern about Heimbach. (*Id.*

6  at ¶ 11; Park Decl. at ¶ 13.)  The customer reported that Heimbach had recently called

7  him and asked him to move his accounts from Fidelity to Heimbach at LPL and asked

8  to meet. (Park Decl. at ¶ 13; Blickenstaff Decl. at ¶ 11.)  The customer agreed to meet

9  Heimbach at his home. (Park Decl. at ¶ 13; Blickenstaff Decl. at ¶ 11.)  When they

10  met, Heimbach had pre-filled out account forms with the customer's personal and

11  Fidelity account information. (Park Decl. at ¶ 13; Blickenstaff Decl. at ¶ 11.)  The

12  customer called the internal Fidelity line and reported this because he was concerned

13  that Heimbach, who had not been a Fidelity employee for several months, had his

14  personal and account information. (Park Decl. at ¶ 13; Blickenstaff Decl. at ¶ 11.)[1]

15  This report concerned Fidelity for two reasons.  First, the customer's report

16  contradicted the representations Heimbach and Mr. Gillies made that Heimbach had

17  not solicited customers, but had only sent an announcement about his new position.

18  (Blickenstaff Decl. at ¶ 12.)  Second, the customer's report contradicted Heimbach's

19  sworn affidavit, which indicated he had returned all Fidelity information. (*Id.*)  The

20  only information Heimbach returned was the list of customers and their addresses, not

---

[1] The Fidelity representative who received the customer's call prepared a written report concerning the content of the call at or around the time it occurred, and memorialized this report in Fidelity's Norkom system pursuant to its regular business practices and procedures. Accordingly, the report – which is attached to the Declarations of Michael MacDonald and Eric Bronner – is admissible as a business record. *See Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046-47 (9th Cir. 1999) (holding that business records maintained in the ordinary course of business are admissible evidence pursuant to Federal Rule of Evidence 803(6)).

10

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  customer account information. (*Id.*) This report strongly suggested that Heimbach
2  has customer account information, and lied about it in his affidavit. (*Id.*)

3  Given this report, Fidelity began questioning the representations Heimbach had
4  made in the affidavit. (*Id.* at ¶ 13.) Fidelity reviewed the customer list he returned
5  again and was skeptical that Heimbach could memorize 89 first and last names and the
6  cities in which those customers lived, so Fidelity looked at the list and tried to find
7  some of the individuals using www.whitepages.com with only that information. (*Id.*)
8  Based on a brief search, it appears there are multiple entries for many customers on
9  Heimbach's list in the cities in which they live, and that some of the addresses on
10 Heimbach's list are not available on the internet. (*Id.*) Without additional information
11 about these individuals, whether in written form or in Heimbach's memory, it is
12 impossible to identify which of them is a Fidelity customer. (*Id.*) This suggested to
13 Fidelity that Heimbach may have misappropriate more customer information from
14 Fidelity than he had represented. (*Id.*)

15 After receiving the March 13, 2013 report that Heimbach had Fidelity customer
16 account information in his possession and was using it to solicit Fidelity customers at
17 their homes to transfer their accounts to LPL, Fidelity also reviewed a report
18 evidencing Heimbach's daily customer screen look-up activity in the days leading up
19 to his resignation to see if there was any unusual activity. (Park Decl. at ¶ 16.)

20 Fidelity financial representatives, including Account Executives like Heimbach,
21 utilize Fidelity's computer systems to access confidential customer screen shots as
22 they service Fidelity customers. (*Id.* at ¶ 15.) Fidelity's Account Executives use these
23 customer screen shots because they provide all the most sensitive financial and
24 personal information necessary to service each customer's financial needs, including
25 their names, social security numbers, addresses, telephone numbers, financial net
26 worth, invested assets, information about all of their investments and other
27 confidential and proprietary information about each customer. (*Id.*) In reviewing the
28 look-up activity in the 90 days prior to Heimbach's resignation, there were several

days with a substantial number of screen shot look-ups often done in "surges" of looking up several customers in rapid-fire succession over the course of minutes. (*Id.* at ¶ 16.)  For example:

- On September 14th, Heimbach looked up 39 customers with 25 look-ups occurring in the 11 minutes between 2:40 and 2:51 p.m.
- On September 20th, Heimbach looked up 41 customers with 20 look-ups occurring in the 13 minutes between 12:05 and 12:18 p.m.
- On October 11th, Heimbach looked up 61 customers with 27 look-ups occurring in the 11 minutes between 3:29 and 3:40 p.m.
- On October 17th, Heimbach looked up 56 customers with 32 look-ups occurring in the 32 minutes between 4:01 and 4:33 p.m.
- On October 31st, Heimbach looked up 69 customers with 29 look-ups occurring in the 28 minutes between 11:49 and 12:17 p.m.
- On November 1st, Heimbach looked up 65 customers with 20 look-ups occurring in the 11 minutes between 1:32 and 1:43 p.m.
- On November 2nd, Heimbach looked up 57 customers with 19 look-ups occurring in the 17 minutes between 3:36 and 3:52 p.m.
- On November 29th, Heimbach looked up 39 customers with 19 look-ups occurring in the 12 minutes between 3:41 and 3:53 p.m.
- On November 30th, Heimbach looked up 64 customers with 18 look-ups occurring in the 14 minutes between 2:40 and 2:54 p.m.
- On December 5th, Heimbach looked up 66 customers with 34 look-ups occurring in the 35 minutes between 11:20 and 11:55 p.m.

(*Id.* at ¶ 17)  On December 13, 2012, the day Heimbach resigned at 3:56 p.m., he looked up 75 Fidelity customers including 23 customers in one 39-minute span. (*Id.*)  In Ms. Park's years of experience at Fidelity, a representative on average looks up between 15-30 customers per day.  (*Id.*)

///

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  Fidelity requires, as part of its customer interaction policy, that representatives

2  record qualifying customer interactions into a system called "Siebel," Fidelity's

3  customer interaction software.[2] (*Id.* at ¶ 18.) Because account executives are to

4  access a client's confidential information to service the client's account, ordinarily a

5  Siebel entry should accompany any account look-up. (*Id.* at ¶ 19.) Of the 75 look-ups

6  Heimbach did on the day he resigned, 54 of them did not have a corresponding Siebel

7  entry reflecting a customer interaction. (*Id.*) There is no legitimate Fidelity business

8  purpose for accessing Fidelity confidential customer information for dozens of

9  customers immediately before (and after) resigning without a corresponding entry in

10  Siebel to reflect an interaction with that customer. (*Id.*) Accordingly, Heimbach's

11  look-up activity strongly suggests he was accessing Fidelity customer information for

12  the improper purpose of removing it from Fidelity to use in his new position on behalf

13  of a competitor. (*Id.*)

14  In sum, Fidelity only recently learned that, despite the attestations in the

15  affidavit he signed, Heimbach continues to possess Fidelity customer information and

16  to solicit Fidelity customers to transfer their business from Fidelity to LPL. (*Id.* at ¶

17  20; Blickenstaff Decl. at ¶ 14.) In particular, Fidelity reasonably believes, based on

18  the above-detailed customer reports, that Heimbach has taken and misused Fidelity's

19  confidential and trade secret customer information in an effort to solicit Fidelity

20  customers, and then provided false information to counsel for LPL and Fidelity.

21  (Blickenstaff Decl. at ¶¶ 14, 17; Park Decl. at ¶ 14.) Additionally, despite signing an

22  affidavit, for the reasons stated above, Fidelity is concerned that Heimbach has not

23  returned and/or deleted all Fidelity confidential and trade secret customer information.

24  (Blickenstaff Decl. at ¶¶ 14, 17; Park Decl. at ¶ 14.)

25

26

27  [2] These records created in Siebel are made soon after the interaction occurs, as

28  required by Fidelity, and are created, kept, and maintained by Fidelity in the ordinary
   course of its business.

13

**G.    Fidelity Faces A Threat Of Immediate And Irreparable Harm From Heimbach's Conduct.**

Heimbach's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. (Blickenstaff Decl. at ¶ 16; Park Decl. at ¶ 20.) Indeed, the impact that Heimbach's conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing good will, losing future business or referrals, as well as losing trust and confidence in securing inherently-private information, which cannot be calculated with precision and cannot be adequately compensated. (Blickenstaff Decl. at ¶ 16; Park Decl. at ¶ 20.) Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. (Blickenstaff Decl. at ¶ 16; Park Decl. at ¶ 20.) Thus, customers understandably are concerned when former Fidelity employees, such as Heimbach, have access to their information and are using it to solicit their business at a new and different brokerage institution. (Blickenstaff Decl. at ¶ 16; Park Decl. at ¶ 20.) In other words, the damage to Fidelity's customer relationships has already occurred, is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Heimbach took and improperly misused confidential and trade secret customer information on behalf of a competitor. (Blickenstaff Decl. at ¶ 16; Park Decl. at ¶ 20.)

Faced with Heimbach's continuing solicitation of Fidelity's customers, his intentional misappropriation of Fidelity's confidential and trade secret customer information, his demonstrably false reports in response to Fidelity's attempts to work with Heimbach to resolve these issues, and the resultant irreparable harm to Fidelity, Fidelity is left with no alternative but to seek immediate redress from this Court and

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  FINRA. (Blickenstaff Decl. at ¶ 17.)[3]

2  **LEGAL ARGUMENT**

3  Fidelity is entitled to an immediate 20 day TRO and an OSC regarding

4  preliminary injunctive relief to protect Fidelity's Confidential Information from

5  Heimbach's unlawful misappropriation under California law, as well as under the

6  terms of Heimbach's Employee Agreement. Fidelity does not object to Heimbach's

7  departure to work on behalf of a competitor, LPL. As described above and in the

8  accompanying Application, however, Heimbach's actions go far beyond permissible

9  bounds. Heimbach improperly and without regard to the rights of Fidelity and its

10  customers used Fidelity's confidential and trade secret customer information that he

11  stole from Fidelity to target, solicit and attempt to divert Fidelity customers to LPL.

12  Fidelity's attempt to resolve this situation short of litigation did not work because

13  Heimbach was apparently not forthcoming in his affidavit about his conduct or the

14  information he possesses. Accordingly, Fidelity seeks a narrowly tailored TRO and

15  preliminary injunction enjoining Heimbach from using or disclosing Fidelity's trade

16  secrets, as detailed in the accompanying [Proposed] Order.

17  California courts routinely grant injunctions barring employees from using their

18  former employers' customer information to solicit the customers of their former

19  employers. *Merrill Lynch v. Chung*, No. 01-659, 2001 WL 283083, *4 (C.D. Cal.

---

[3] Courts consistently grant TROs filed after plaintiff's attempt to resolve the issues out of court has failed. Most recently, the U.S. District Court for the Southern District of California stated, "Fidelity acted diligently to protect its trade secret information and should not be faulted for attempting to reach an amicable solution without involving the Court." *Fidelity v. McNamara*, No. 11-1092, 2011 WL 2117546, *5 (S.D. Cal. May 27, 2011) (finding that three-month delay in filing lawsuit was not a reason to deny TRO where Fidelity initially tried to resolve the issue with defendants without court intervention); *Earth Tech. Corp. v. Envt.l Research & Tech., Inc.*, 1984 WL 877, *2 (C.D. Cal. 1983) ("a party will not be charged with delay attributable to efforts to settle the dispute) (citing *Steinway & Sons v. DeMars & Friends*, 210 U.S.P.Q. 954, 967 (C.D. Cal. 1981)).

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1    Feb. 2, 2001) (granting TRO to protect customer lists); *Merrill Lynch v. Garcia*, 127

2    F. Supp. 2d 1305, 1306 (C.D. Cal. 2000) (granting preliminary injunction to protect

3    customer list); *Gable-Leigh, Inc. v. N. Am. Miss*, No. 01-01019, 2001 WL 521695,

4    *20 (C.D. Cal. Apr. 13, 2001) (same); *ReadyLink Healthcare v. Cotton*, 126

5    Cal.App.4th 1006, 1018 (2005) (affirming preliminary injunction protecting customer

6    list where plaintiff "went to great expense to compile the data"); *Morlife, Inc. v. Perry*,

7    56 Cal.App.4th 1514, 1522 (1997) (affirming permanent injunction protecting

8    customer list where "the patronage of such customers was secured through the

9    expenditure of considerable time and money"); *Klamath-Orleans Lumber, Inc. v.*

10   *Miller*, 87 Cal.App.3d 458, 464 (1978) (affirming permanent injunction protecting

11   customer list, noting that "an employee . . . should not be allowed to exploit

12   information which his employer compiled at great expense and which represents a

13   valuable business asset"). The Uniform Trade Secrets Act ("UTSA") expressly

14   provides for injunctive relief for either the actual or threatened misappropriation of

15   trade secrets. Cal. Civ. Code § 3426.2(a), (c).

16            Fidelity vigorously seeks to protect its confidential and trade secret information.

17   Since 2003, Fidelity has sought and obtained injunctive relief to protect its

18   confidential and trade secret information in numerous similar cases, which include

19   two TROs granted by the United States District Court for the Central District of

20   California and two TROs granted by the United States District Court for the Southern

21   District of California: *Fidelity Brokerage Serv. LLC v. McNamara*, No. 11-1092 ,

22   2011 WL 2117546 (S.D. Cal. May 27, 2011); *Fidelity Brokerage Serv. LLC v.*

23   *Fassenfeld*, Case No. 013945/11 (NY Sup. Ct. Sept. 28, 2011); *Fidelity Brokerage*

24   *Serv. LLC v. Wilder*, Case No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011); *Fidelity*

25   *Global Brokerage Group v. Gray*, Case No. 10-1255 (E.D. Va. Nov. 9, 2010); *Fidelity*

26   *Global Brokerage Group v. Beatty*, Case No. 652147 (NY Sup. Ct. Dec. 6, 2010);

27   *Fidelity Brokerage Serv. v. Rousseaux*, Case No. 03- 01319 (D. Md. 2003); *Fidelity*

28   *Brokerage Serv. v. Donovan*, Case. No. 03-2286 (Mass Super. Ct. 2003); *Fidelity*

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

16

*Brokerage Serv. v. Alexopoulos*, Case No. 03-5362 (Mass. Super. Ct. 2003); *Fidelity Brokerage Serv. v. Jones*, Case. No. 04-3478 (S.D. Tex. 2004); *Fidelity Brokerage Serv. v. Parker*, Case No. 04- 1027 (S.D. Cal. 2004); *Fidelity Brokerage Serv. v. Johnson*, Case No. A04-CA-662-SS (W.D. Tex. 2004); *Fidelity Brokerage Serv. LLC v. Sanchez*, Case No. 08-03863 (C.D. Cal. 2008); *Fidelity Brokerage Serv. v. Stockwell*, Case No. 05-0455 (Mass. Super. Ct. 2005); *Fidelity Brokerage Serv. v. Rupp*, Case No. 05- 00083 (D.N.H. 2005); *Fidelity Brokerage Serv. v. Umstead*, Case No. 07-347 (E.D. Va. 2007); *Fidelity Brokerage Serv. v. Vance*, Case No. 07-1230 (C.D. Cal. 2007); *Fidelity Brokerage Serv. v. Downey*, Case No. 08-1637 (JFB) (E.D.N.Y. April 28, 2008); and *Fidelity Brokerage Serv. LLC v. Franz*, Case No. 8/9564 (NY Sup. Ct. May 7, 2008). In each instance, Fidelity successfully obtained a TRO to protect Fidelity's confidential and trade secret information and to stop ongoing solicitation of its customers.

## I.   THE STANDARDS FOR GRANTING TEMPORARY INJUNCTIVE RELIEF STRONGLY FAVOR GRANTING FIDELITY RELIEF IN THIS CASE.

"The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment." *Cruz v. Washington Mut. Bank*, 2011 U.S. Dist. LEXIS 25439, *4 (S.D. Cal., Mar. 14, 2011) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974)). The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *Id.*

In particular, the Ninth Circuit has recognized the propriety of granting injunctive relief in aid of arbitration. *See Toyo Tire Holdings of Am., Inc. v. Continental Tire of N. Am.*, 609 F.3d 975, 980 (9th. Cir. 2010); *see also McNamara*, 2011 WL 2117546 at *2. As the Court noted in *Toyo Tire Holdings*, "the congressional desire to enforce arbitration agreements would frequently be frustrated

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  if the courts were precluded from issuing preliminary injunctive relief to preserve the

2  status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration

3  process." 609 F.3d at 980 (citations omitted). In reversing the district court's denial

4  of Toyo's motion for a preliminary injunction and TRO, the Court confirmed that "a

5  district court may issue interim injunctive relief on arbitrable claims if interim relief is

6  necessary to preserve the status quo and the meaningfulness of the arbitration process

7  – provided, of course, that the requirements for granting injunctive relief are otherwise

8  satisfied." *Id.* at 981. As detailed below, the requirements for granting the injunctive

9  relief requested by Fidelity are more than satisfied.

10      Fidelity is entitled to injunctive relief because Fidelity can demonstrate: (1) a

11  likelihood of success on the merits; (2) a likelihood of irreparable harm to Fidelity in

12  the absence of preliminary relief; (3) that the balance of the equities tips in its favor;

13  and (4) that the injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los*

14  *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Garcia*, 127 F. Supp. 2d at 1305;

15  *Chung*, 2001 WL 283083 at *3; *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir.

16  1993).

17  **II.**    **FIDELITY IS LIKELY TO SUCCEED ON THE MERITS OF ITS**

18          **CLAIMS.**

19      **A.**     **Heimbach Misappropriated Fidelity's Trade Secret Customer**

20          **Information In Violation Of The UTSA.**

21      The UTSA prohibits employees from misappropriating their former employers'

22  trade secrets. Trade secrets are defined by the UTSA as information that:

23      (1)    Derives independent economic value, actual or potential,

24          from not being generally known to the public or to other

25          persons who can obtain economic value from its disclosure

26          or use; and

27      (2)    Is the subject of efforts that are reasonable under the

28          circumstances to maintain its secrecy.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

18

1    Cal. Civ. Code § 3426.2(d).

2      The UTSA provides for injunctive relief to protect an employer's trade secret

3 customer list. *Chung*, 2001 WL 283083 at *4. Over 150 courts, including a number

4 of California courts, have granted retail brokerage firms, such as Fidelity, the relief

5 that Fidelity seeks here. *See e.g., Garcia*, 127 F. Supp. 2d at 1305; *Chung*, 2001 WL

6 283083 at *3; *Salvano*, 999 F.2d at 215. The Seventh Circuit in *Salvano* easily found

7 injunctive relief appropriate for misappropriation of customer data:

8        [T]he available evidence—indicating that Salvano and Coon

9        took various documents and information pertaining to

10        Merrill Lynch's client and used that information to solicit

11        Merrill Lynch customers—sufficiently supports the Court's

12        determinations regarding irreparable harm and the

13        inadequacy of Merrill Lynch's legal remedy.

14 *Salvano*, 999 F.2d at 215.

15      Likewise, in *Merrill Lynch v. Bradley*, the Fourth Circuit held that ***immediate***

16 injunctive relief is necessary under these circumstances to avoid irreparable harm and

17 to maintain *the status quo*. 756 F.2d 1048, 1054 (4th Cir. 1985) ("An injunction even

18 a few days after solicitation has begun is unsatisfactory because the damage is

19 done."); *see also FMC Corp. v. Varco, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982)

20 (emphasizing that absent immediate injunctive relief an employer's trade secrets

21 "could be lost before a full trial on the merits could be held"); *Chung*, 2001 WL

22 283083 at *5-6.

23      California courts uniformly hold, and the California Supreme Court has

24 confirmed, that "[a] violation of the UTSA occurs when an individual misappropriates

25 a former employer's protected trade secret client list, for example, by using the list to

26 solicit clients." *Reeves v. Hanlon*, 33 Cal.4th 1140, 1155 (2004); *see also Hanger*

27 *Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F.Supp.2d 1122, 1136

28 (E.D. Cal. 2008) (citing *Reeves*); *Pyro Spectaculars North, Inc. v. Souza*, 861

*Locke Lord LLP*
*300 South Grand Avenue, Suite 2600*
*Los Angeles, CA 90071*

19

1  F.Supp.2d 1079, 1089-92 (E.D. Cal. 2012) (enjoining defendant from
2  misappropriating trade secret customer information in violation of UTSA); *Chung*,
3  2001 WL 283083 at *4 (finding the UTSA "provides for injunctive relief to protect an
4  employer's trade secret customer list"); *Gallagher Benefit Servs., Inc. v. De La Torre*,
5  283 Fed.Appx. 543, 546 (9th Cir. 2008) (enjoining former employee under UTSA
6  from misappropriating trade secret customer list); *Gable-Leigh*, 2001 WL 521695 at
7  *20 (enjoining use of protected customer list); *ReadyLink*, 126 Cal.App.4th at 1018
8  (affirming preliminary injunction protecting customer list where plaintiff "went to
9  great expense to compile the data"); *Morlife*, 56 Cal.App.4th at 1522 (affirming
10 permanent injunction protecting customer list where "the patronage of such customers
11 was secured through the expenditure of considerable time and money"); *Klamath-*
12 *Orleans*, 87 Cal.App.3d at 464 (affirming permanent injunction protecting customer
13 list, noting that "an employee…should not be allowed to exploit information which
14 his employer compiled at great expense and which represents a valuable business
15 asset") (citations omitted).

        1.    <u>Fidelity's Customer Information Is A Trade Secret Under The</u>
                <u>UTSA.</u>

18       Fidelity's customer data qualifies as a trade secret under the UTSA, because (as
19 described above) the confidentiality of the data gives Fidelity a competitive advantage
20 over competitors who do not have access to the data, and because Fidelity takes
21 reasonable measures to preserve the data as a trade secret.  Cal. Civ. Code § 3426.

22       California courts recognize that customer information "has economic value
23 because its disclosure would allow a competitor to direct its sales efforts to those
24 customers who have already shown a willingness to use a unique type of service or
25 product as opposed to a list of people who only might be interested." *Morlife*, 56
26 Cal.App.4th at 1522.

27       Additionally, Fidelity's information qualifies as a trade secret under the factors
28 that California courts consider on this issue: (1) the extent to which the information is

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1 known outside the business; (2) the extent to which it is known to those inside the

2 business, i.e., by the employees; (3) the precautions taken by the holder of the trade

3 secret to guard the secrecy of the information; (4) the savings effected and the value to

4 the holder in having the information as against competitors; (5) the amount of effort or

5 money expended in obtaining and developing the information; and (6) the amount of

6 time and expense it would take for others to acquire and duplicate the information.

7 *Garcia*, 127 F. Supp. 2d at 1305; *Chung*, 2001 WL 283083 at *3. Generally,

8 reasonable efforts have been held to include advising employees of the existence of a

9 trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling

10 access. *Courtesy Temporary Service v. Camacho*, 222 Cal.App.3d 1278, 1288 (1990);

11 *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993).

12     Specifically, Fidelity's customer lists and information are entitled to trade secret

13 protection because Fidelity takes reasonable if not painstaking steps to keep the

14 information confidential. To ensure that Fidelity's valuable customer information

15 remains confidential, Fidelity (a) password-protects all computers containing

16 customer information, (b) limits which employees have access to the passwords, (c)

17 enforces a Confidentiality Policy limiting use and access to customer information, (d)

18 reminds its employees periodically of the confidential and proprietary nature of its

19 business information, (e) enters into non-disclosure agreements with employees, and

20 (f) performs exit interviews on all departing employees during which it expressly

21 reminds them of their confidentiality agreements with Fidelity. *See Am. Credit Indem.*

22 *Co. v. Sacks*, 213 Cal.App.3d 622, 631 (1989) (plaintiff "required its employees to

23 sign confidentiality agreements respecting its client list...[t]hus, under the UTSA, the

24 [employer's] customer list constitutes a trade secret"); *MAI Sys. Corp.*, 991 F.2d at

25 521 (Employer "required its employees to sign confidentiality agreements respecting

26 its trade secrets, including the Customer Database. Thus, under the UTSA, the

27 [employer's] Customer Database constitutes a trade secret."); *Pyro Spectaculars*, 861

28 F.Supp.2d at 1090-91 (finding customer information to be a trade secret because

21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1  plaintiff required its employees to sign confidentiality agreements, required employees

2  to use password-protected computers, and limited the availability of the data based on

3  geographic region and job description); *Chung*, 2001 WL 283083 at *4 (finding

4  requirement of signing agreements prohibiting use or disclosure of customer

5  information reasonable protection of trade secret).[4]

6        California courts will grant injunctive relief to stop former employees from

7  using trade secret customer information belong to their former employers. *See Am.*

8  *Credit Indem. Co*, 213 Cal.App.3d at 637; *IMI-Tech Co. v. Gaaliani*, 691 F. Supp.

9  214, 233 (S.D. Cal. 1986). As the court explained in *Readylink Healthcare*:

10              [T]he UTSA and case law "establish that a customer list

11              procured by substantial time, effort, and expenses is a

12              protectable trade secret." Such a list is a protectable even if

13              the list contains information available to the public or

14              competitors: "[E]ven if the customers' names could be

15              found in telephone or trade directories, such public sources

16              'would not disclose the persons who ultimately made up the

17              list of plaintiff's customers.'" It is the list of persons who

18

19  _____

20  [4] Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its

21  implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the

22  privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The implementing

23  regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10.

24  Nonpublic personal information is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the

25  identity of an individual as being a customer of a particular financial institution is

26  specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. §

27  248.3(u)(2)(i)(D). Indeed, these regulations also protect a customer's account

28  information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1                  actually purchase [plaintiff's] services that constitute

2                  confidential information.

3 *Readylink Healthcare*, 126 Cal.App.4th at 1019-20 (internal citations omitted).

4        In the instant case, Fidelity is substantially likely to succeed on the merits of its

5 claim. The confidential customer information is entitled to trade secret protection

6 because Fidelity derives tremendous economic value from the fact that such

7 information is not available to its competitors. Fidelity's confidential customer

8 information includes the names, addresses, telephone numbers, financial information,

9 investment information and other confidential information about each Fidelity

10 customer, all of which Fidelity uses in servicing its customers. Fidelity has compiled

11 this information in the course of developing long-standing relationships with its

12 customers, in which it has invested a large amount of time, labor, and resources.

13 Clearly, access to this information gives Heimbach a significant competitive

14 advantage. Moreover, California courts are unequivocal that trade secret information

15 does not lose its status as a trade secret simply because an employee commits it to

16 memory. *Courtesy*, 222 Cal.App.3d at 1292; *Klamath-Orlean*, 87 Cal.App.3d at 458

17 (affirming grant of permanent injunction in case involving memorization of

18 confidential customer lists). Given that Fidelity has invested significant resources to

19 develop this customer information, it would be extremely unfair to allow Heimbach to

20 use the information as his own marketing list, without having made the same

21 investment.

22        Thus, Fidelity's customer information is valuable and has been recognized as

23 such by numerous California courts. And the value of Fidelity's customer information

24 is perhaps best reflected, and underscored, by the fact that Heimbach immediately

25 used the information to attempt to launch his career at LPL and has continued using

26 the information. To permit a competitor unfettered access to this information would

27 give that competitor a significant advantage over Fidelity in that the competitor could

28 utilize the information without having made the necessary investments in compiling

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

23

1  the information. Additionally, Fidelity has been vigilant in protecting the customer

2  information. Fidelity requires all employees who have access to the information to

3  sign non-disclosure agreements, and Fidelity does not make the information available

4  to anyone who has not signed such an agreement.

5          2.      Heimbach Misappropriated Fidelity's Trade Secret Customer

6                  Information.

7      The UTSA defines misappropriation as:

8              Disclosure or use of a trade secret of another without

9              express or implied consent by a person who…[a]t the time

10             of disclosure or use, knew or had reason to know that his or

11             her knowledge of the trade secret was …[a]cquired under

12             circumstances giving rise to a duty to maintain its secrecy or

13             limit its use.

14  Cal. Civ. Code § 3426.2(b)(2).

15     Heimbach has indisputably misappropriated Fidelity's confidential and trade

16  secret customer information and is soliciting Fidelity customers in violation of the

17  UTSA and his Employee Agreement. The Employee Agreement expressly prohibits

18  Heimbach from soliciting Fidelity customers for one year after Heimbach's

19  employment ends. The UTSA defines "misappropriation" as the acquisition,

20  disclosure, or use of a trade secret of another, without express or implied consent, by a

21  person who knows or has reason to know that the trade secret was acquired, disclosed,

22  or used through improper means. Cal. Civ. Code § 3426.1(b). "Improper means" is

23  defined as, *inter alia*, "misrepresentation, breach or inducement of a breach of a duty

24  to maintain secrecy." *Id.* § 3426.1(a). "[M]isappropriation occurs if information from

25  a customer database is used to solicit customers." *Chung*, 2001 WL 283083 at *4.

26  ///

27  ///

28  ///

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

24

3.  Heimbach Did More Than Announce; After Denying Any
    Solicitation He Solicited A Customer By Phone And In His Home
    Using His Fidelity Account Information.

After signing an affidavit attesting all information had been returned and promising to abide by his agreement, Heimbach solicited a customer by phone and in his home and showed up with forms containing the customer's personal and Fidelity account information, prompting the customer to call Fidelity to report the incident. Heimbach cannot avoid liability by arguing he did not "solicit" Fidelity customers, but merely "announced" his move to LPL.[5] Even if a former employee were permitted to

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

[5]  The subject case is a far cry from *Aetna Building Maint. Co., Inc. v. West*, 39 Cal.2d 198 (Cal. 1952), the seminal California case on the "announcement rule." In *Aetna*, a salesman for Aetna announced to "three out of 50 to 75 establishments with which he had worked for Aetna that he had gone into business for himself." *Id.* at 200. Subsequently, "he visited one firm . . . *but did not solicit business*" and submitted estimates "to two firms *upon their invitation*." *Id.* (emphasis added.) The Court concluded, "Merely informing customers of one's former employer of a change of employment, without more, is not solicitation. Nor does the willingness to discuss business *upon invitation of another party constitute solicitation on the part of the invitee*." *Id.* at 204. (Emphasis added.) Fidelity does not seek to enjoin Heimbach from "informing" anyone of his "change of employment." Indeed, Heimbach already has done so. Nor does Fidelity seek to enjoin Heimbach from "discuss[ing] business upon invitation of another party." Rather, Fidelity asks this Court to enjoin Heimbach from using Fidelity's Confidential Information to *solicit* business from Fidelity's customers. *Accord Garcia*, 127 F. Supp. 2d at 1305-06 (granting preliminary injunction against former Merrill Lynch employees and Smith Barney because, on top of announcing new employment, Smith Barney vice president provided Merrill Lynch customers with "documentation to transfer their accounts to Smith Barney."). Fidelity's request is in alignment with the Court's holdings in *Aetna* and *Garcia*.

Moreover, it is essential to note that nothing about *Aetna,* or its progeny, suggests that, even if a former employee makes only a pure announcement to this former employer's customers, he can then retain the former employer's trade secret information he used to make the announcement. To permit such retention would undercut entirely UTSA and California case law protecting customer lists as trade secrets. In other words, assuming, purely for the sake of argument, that Heimbach's solicitations could be characterized as "announcements," the announcements have been made, and Heimbach cannot be permitted to continue to retain any documents that contain

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    use a trade secret customer list to make "announcements" to the customers of a former

2    employer, that exception to the UTSA would not apply to this case because

3    solicitation is clearly prohibited under California law. *See Reeves*, 33 Cal. 4th at 1156

4    ("an individual may violate the UTSA by using a former employer's confidential

5    client list to *solicit* clients") (emphasis in original). Thus, assuming purely *arguendo*

6    that Heimbach's initial letter to Fidelity customers was a protected "announcement"

7    under California law, Heimbach's continuing actions clearly go beyond merely

8    announcing a move and constitute illegal solicitation.

9        An announcement is "[m]erely informing a former employer's customers of a

10   change of employment." *MAI Sys. Corp.*, 991 F.2d at 521. Solicitation is

11   "endeavoring to obtain [customers'] business." *Am. Credit Indem. Co.*, 213

12   Cal.App.3d at 636 (former employee crossed the line from announcement to

13   solicitation where: (1) the defendant "invites [her customers'] inquiry about the [new

14   employer's] policy and indicates she would be happy to discuss it in detail"; (2) "she

15   personally petitions, importunes and entreats [her former employer's] customers to

16   call her at any time for information about the better policies [her new employer] can

17   provide"; and (3) offers her "assistance during the agent transition period."); *see also*

18   *MAI Sys. Corp.*, 991 F.2d at 521-22 (former employee had done "more than merely

19   announce his new affiliation" when he "called [his former employer's] customers

20   whose names he recognized" and "personally went to visit some of these [former

21   employer's] customers with proposals to try and get them to switch over" to his new

22   employer).

23       In *Chung*, the court, in considering a request for injunctive relief by Merrill

24   Lynch in a situation substantially similar to this case, also found that the practice of

25   following up an announcement mailing with calls constituted solicitation:

26

27

28   Fidelity's Confidential Information. Consequently, *Aetna* must be narrowly
     interpreted.

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1      Defendants' mailing of the written announcements alone did

2      not constitute solicitation under California law.  However,

3      Defendants did solicit Merrill Lynch customers by placing

4      direct and personal follow-up calls to Merrill Lynch

5      customers. . . During the phone calls initiated by

6      Defendants, Defendants discussed with the customers the

7      potential transfer of customers' accounts, the differences

8      between Merrill Lynch and Smith Barney and, in at least

9      one conversation, why Smith Barney is better than Merrill

10     Lynch . . . . This conduct constitutes a breach of contract and

11     extends beyond the scope of the announcement doctrine

12     under California law.

13 2001 WL 283083 at *4.  In *Charles Schwab & Co. v. McMurry*, the court was

14 presented with a similar fact pattern in which a former employee attempted to contact

15 his former employer's customers on multiple occasions.  2008 WL 5381922 at *3

16 (M.D. Fla. Dec. 23, 2008).  The *McMurry* court explained that such behavior

17 necessarily constitutes solicitation:

18

19

20     McMurry asserts that sending out "announcements" does not

21     violate the 2008 Contract. McMurry, however, did more

22     than merely send out an "announcement," he followed up

23     each announcement with a telephone call. Defendant would

24     then follow up with a second telephone call if he was forced

25     to leave a message the first time he called. The Court finds

26     such targeted contact aimed at current Schwab clients

27     violates the non-solicitation provision of the 2008 Contract.

28

1   *Id.* In the present case, as outlined above, Heimbach's conduct went far beyond a

2   mailed announcement and included requests for and attendance at in-home visits with

3   Fidelity customers and pre-filled in documents with Fidelity account information in

4   them.

5         Heimbach possesses, has used and continues to use Fidelity's confidential and

6   trade secret information on behalf of himself and his new employer, LPL, in clear

7   violation of the UTSA. Accordingly, Fidelity is likely to succeed on its

8   misappropriation of trade secrets claim.

9      **B.**    **Fidelity Will Prevail On Its Breach Of Contract Claim.**

10         In addition to violating the UTSA, Heimbach's solicitation of Fidelity

11   customers is a breach of at least two provisions of his Employment Agreement. That

12   Agreement contained both non-solicitation and non-disclosure clauses which prohibit

13   Heimbach's continued use of Fidelity's trade secret customer information. (Park

14   Decl. at Ex. 2.) Such agreements, which prohibit an employee from using confidential

15   customer information, are "enforceable under California law." *Chung*, 2001 WL

16   283083 at \*5; *see also MAI Sys. Corp.*, 991 F.2d at 522 (affirming preliminary

17   injunction to prohibit violation of non-solicitation agreement).[6] Heimbach was

18

---

19  [6] The Employee Agreement contains a Massachusetts choice of law provision.
20  Fidelity would be entitled to an injunction on its contract claim under Massachusetts
   law just as it is under California law. Massachusetts courts enforce non-solicitation
21  and non-compete clauses if those agreements are reasonably necessary to protect the
   employer's legitimate business interests, including the protection of trade secrets.
22  *Kroeger v. Stop & Shop Co., Inc.*, 432 N.E.2d 566, 570 (Mass. Ct. App. 1982);
23  *Cereva Networks, Inc. v. Lieto*, 2001 WL 1228040, \*5 (Mass. Super. 2001); *Stone
   Legal Res. Group, Inc. v. Glebus*, 2003 WL 914994 (Mass. Super. 2003) (granting
24  preliminary injunction for former employee's breach of non-solicitation,
25  confidentiality, and non-compete clauses of employment agreement); *Darwin
   Partners, Inc. v. Signature Consultants, LLC*, 2000 WL 33159238, \*4 (Mass. Super.
26  2000) (granting TRO because non-solicitation provision was reasonable in time, space
27  and scope, protected a legitimate business interest and did not violate any public
   interest or public policy); *Fortune Personnel Consultants v. Hagopian*, 1997 WL
28  796494, \*3 (Mass. Super. 1997) (granting preliminary injunction to enforce non-

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    contractually obligated not to exploit Fidelity's confidential and trade secret

2    information, but has done so since before leaving Fidelity and will continue unless

3    enjoined.

4    **C.    Fidelity Will Prevail On Its Claim For Breach Of The Duty Of**

5    **Loyalty.**

6        The elements of a breach of the duty of loyalty claim are: "(1) the existence of

7    a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty;

8    and (3) damage proximately caused by that breach." *Hanger Prosthetics*, 556 F.

9    Supp. 2d at 1142 (citing *Huong Que, Inc. v. Mui LUU*, 150 Cal.App.4th 400, 410

10   (2007)).

11       All employees owe a duty of loyalty to their employers. *Id.* As an employee of

12   Fidelity, Heimbach was one of the chosen employees given access to Fidelity's

13   Confidential Information and indisputably had a duty to exercise the utmost good faith

14   and loyalty with respect to Fidelity's trade secrets in the performance of his duties for

15   Fidelity and thereafter.  Heimbach breached that duty by taking Fidelity's Confidential

16   Information to LPL and using it unlawfully to solicit Fidelity's customers. *See Huong*

17   *Que*, 150 Cal.App.4th at 416-17  (employee breaches duty of loyalty to employer by

18   soliciting or otherwise attempting to divert employer's customers for benefit of

19   himself and new employer).  Fidelity has been and will continue to be irreparably

20   damaged by Heimbach's multiple and continuing breaches of his Employment

21   Agreement.

22

23

24

25

26   solicitation agreement).  Fidelity has successfully obtained a TRO and NASD (n/k/a
     FINRA) permanent injunctions in Massachusetts on each occasion it has sought such

27   injunctions. *See, e.g., Fidelity v. Wilder,* No. Case No. 11-37296 (Mass. Super. Ct.
     Oct. 25, 2011); *Fidelity v. Alexopoulos,* No. 03-5362 BLS; *Fidelity v. Donovan*, No.

28   03-2286 BLS; *Fidelity v. Murray*, No. 99-3039.

*Locke Lord LLP*
*300 South Grand Avenue, Suite 2600*
*Los Angeles, CA 90071*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

III.   **FIDELITY IS SUFFERING IRREPARABLE HARM AS A RESULT OF HEIMBACH'S WRONGFUL AND ONGOING ACTS.**

Irreparable harm is shown by:

> evidence of [plaintiff's] investment of time and money in the
> development of the secret processes misappropriated by
> defendants . . . since harm to [plaintiff's] competitive
> position lacks any adequate remedy at law.

*IMI-Tech*, 691 F. Supp. at 231.  "California courts have held that the solicitation of a company's clients by one of its former employees causes irreparable harm." *Chung*, 2001 WL 283083 at *5 (citing cases).

Fidelity has suffered and will suffer irreparable harm, because it cannot calculate its damages. *Merrill Lynch v. Stidham*, 658 F.2d 1098, 1102 (5th Cir. 1981). The court in *Stidham* described the difficulty of calculating damages flowing from the loss of customer relationships:

> The injury here is such that damages could not adequately
> compensate.  Were defendants permitted by the law to
> exploit the clientele of their former employers, every
> investment that reasonably flowed from the exploitation
> should be included in the damages award.  How such a
> figure could be arrived at escapes us.

*Id.* at n.8; *see also Bradley*, 756 F.2d at 1055 (emphasizing that Merrill Lynch "faced irreparable non-compensable harm in the loss of its customers").  The court in *Chung* similarly found:

> that in the present case [plaintiff] will suffer irreparable
> harm as a result of the breach of client confidentiality,
> conversion of [plaintiff's] property and information,

30

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  
2  
3  

> incalculability of damages, loss of goodwill, and the threat
> to office stability and procedures caused by Defendants'
> violations.

4   *Chung*, 2001 WL 283083 at *5. Fidelity's inability to calculate losses from

5   Heimbach's wrongful conduct supports Fidelity's claim that it faces an immediate

6   threat of irreparable harm.

7        Fidelity also suffers irreparable harm through loss of customer goodwill, even

8   among customers who have declined Heimbach's solicitations to transfer,  who

9   reported being uncomfortable with Heimbach's conduct.  Heimbach's theft and use of

10  customer information while at LPL threatens to cause Fidelity customers to perceive

11  that Fidelity does not protect the security of their confidential financial information.

12  For instance, in *Fidelity v. McNamara*, the U.S. District Court for the Southern

13  District of California found that "[l]oss of goodwill is irreparable harm that warrants

14  injunctive relief," and accordingly held that "the [irreparable harm] factor weigh[ed]

15  in favor of granting Fidelity's request for injunctive relief." 2011 WL 2117546 at *6

16  *see also Gallagher*, 2008 WL 2512489 at *2 (plaintiff's "declaration as to the

17  goodwill and customers that [plaintiff] would lose absent equitable relief supports [the

18  district court's] finding of irreparable injury"); *Stuhlbarg Int'l. Sales Co. v. John D.*

19  *Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of

20  prospective customers or goodwill certainly supports a finding of possible irreparable

21  harm."). Also, in *Merrill Lynch v. Kramer*, the Northern District of Ohio held:

22  
23  
24  
25  
26  
27  

> Plaintiffs argue with equal strength that irreparable and
> immeasurable harm lies in the fact that Merrill Lynch
> clients, when they discover that their financial information,
> market transactions, and investment assets which they
> presumed were held in confidence have been disclosed, will
> lose trust and confidence in Merrill Lynch.

28

31

1  816 F. Supp. 1242, 1247 (N.D. Ohio 1992); *see also Merrill Lynch v. Zimmerman*,

2  No. 96-2412, 1996 WL 707107, *2 (D. Kan. Oct. 1, 1996) ("[W]ithout a TRO, the

3  plaintiff will lose good will from certain clients when they discover that their

4  supposedly confidential information was stolen."). An injunction is required to

5  prevent Fidelity customers from losing confidence in Fidelity's ability to adequately

6  protect their personal financial information. Indeed at least one customer was so

7  concerned that he reported to Fidelity that he was uncomfortable with Heimbach

8  having his personal contact and financial information months after he left Fidelity.

9       When (as is the case here) there is compelling evidence that a former employee

10  is in possession of customer information and soliciting his former employer's

11  customers in violation of the UTSA and non-solicitation agreements, California courts

12  do not hesitate to enjoin threatened future solicitation. *See, e.g., ReadyLink*, 126

13  Cal.App.4th at 1011, 1018 (where employee improperly acquired trade secrets and

14  then used those secrets when he went to work for competitor, court concluded that

15  "there remained an imminent threat of him using the trade secret information to solicit

16  ReadyLink's employees and customers"); *Gallagher*, 2008 WL 2512489 at *2; *Gable-

17  Leigh*, 2001 WL 521695 at *20; *Morlife*, 56 Cal.App.4th at 1522; *Klamath-Orleans*,

18  87 Cal.App.3d at 464. Unless Heimbach is restrained and enjoined by this Court,

19  Fidelity undoubtedly will continue to suffer irreparable harm in the form of

20  incalculable loss of good will. .

21  **IV.**   **THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR**

22       **GRANTING THE REQUESTED INJUNCTIVE RELIEF.**

23      **A.**    **The Balance Of Equities Tips Strongly In Favor Of Fidelity.**

24       The benefit of injunctive relief to Fidelity far outweighs any detriment to

25  Heimbach and serves the public interest. An injunction would protect Fidelity's

26  valuable trade secrets, goodwill, business reputation, methods of business operation,

27  and contract rights. The reasoning of the *Chung* court is equally applicable to the

28  present case:

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    the balance of hardships tips heavily in favor of granting

2    injunctive relief because an injunction merely prohibits

3    Defendants from misappropriating the trade secrets of [the

4    plaintiff], and requires them to comply with the reasonable

5    terms of their Agreements.  An injunction will not prevent

6    the Defendants from continuing their employment in the

7    securities industry, will not interfere with their ability to

8    acquire even a fairly limited number of clients of the

9    thousands of potential clients in the area, or from working

10   for [the new brokerage firm] in the community in which

11   Defendants have chosen to work.

12   *Chung*, 2001 WL 283083 at \*6; *see also Pyro Spectaculars*, 861 F.Supp.2d at 1092

13   ("[A]ny injunction issued would be focused on preventing defendant from unlawfully

14   using PSI's trade secrets to solicit PSI's customers.  Such an order would not cause

15   any significant hardship to defendant, because it would essentially only require him to

16   abide by existing law regarding the unauthorized use of another's trade secrets.").

17   **B.    The Public Interest Will Be Served By Granting Injunctive Relief.**

18        The public interest will be served by granting Fidelity's Application because,

19   without the requested injunctive relief, individuals such as Heimbach will be free to

20   violate their contractual obligations with impunity, and competing brokerage

21   institutions will continue to recruit Fidelity employees who can share confidential

22   customer information, thereby shortcutting the time, effort and expense invested by

23   Fidelity to build its clientele.  *See Kramer*, 816 F.Supp. at 1248 ("To deny injunctive

24   relief in this case would . . . jeopardize the integrity of the securities industry to the

25   detriment of the public interest [and] . . . would cast doubt on the integrity of

26   contractual agreements.").  "On the one hand, California has a "settled legislative

27   policy in favor of open competition and employee mobility' . . . On the other hand, the

28   state also has a strong policy in favor of protecting trade secrets." *Pyro Spectaculars*,

33

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1  861 F.Supp.2d at 1092-93 (citations omitted).  In short, the requested relief will not

2  negatively impact the public's interest in competition, and will protect Fidelity's trade

3  secrets.  *See id.* ("find[ing] that an injunction specifically focused on preventing

4  misuse of PSI's trade secrets to solicit PSI's customers would serve the policy of

5  protecting trade secrets while simultaneously allowing lawful competition"); *Immel*,

6  2010 WL 2380877 at *3 (while California has a strong public policy in favor of

7  competition, this interest *yields* to California's interest in protecting a company's trade

8  secrets); *Lee*,  2008 WL 4351348 at *7 (same).

9  **V.    A TEMPORARY RESTRAINING ORDER WILL MAINTAIN THE**

10  **_STATUS QUO_ PENDING ARBITRATION.**

11      A 20 day temporary restraining order is appropriate to preserve the *status quo*

12  that existed as of the last peaceable act - immediately prior to the misappropriation of

13  Fidelity's trade secrets and solicitation of Fidelity's customers.  To preserve that

14  *status quo*, a temporary restraining order should require Heimbach to return all

15  Fidelity data and to refrain from further solicitation of Fidelity customers for whom he

16  misappropriated data.

17      An order enjoining Heimbach from misappropriating Fidelity's trade secret

18  customer information and prohibiting solicitation of Fidelity customers would return

19  the parties to the *status quo* without any undue prejudice to Heimbach's ability to earn

20  a living.  *See, e.g., Chung*, 2001 WL 283083 at *6; *Ruscitto v. Merrill Lynch*, 777

21  F.Supp. 1349, 1354, *aff'd*, 948 F.2d 1286 (5th Cir. 1991) ("The present record plainly

22  shows that Merrill Lynch's request is reasonable.  Ruscitto may continue to compete

23  as a stockbroker in the same locale.  He is merely restricted for one year from

24  soliciting clients whom he served or whose names became known to him while

25  employed at Merrill Lynch."); *see also Morlife*, 56 Cal.App.4th at 1528 ("In view of

26  the clearly established violation of the [UTSA], the injunction correctly draws the line,

27  and leaves Burlingame free to solicit customers whose identities are not the trade

28  secrets of Morlife.").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

VI.    **THIS COURT MAY ENTER INJUNCTIVE RELIEF EVEN THOUGH THE MERITS WILL BE DECIDED IN ARBITRATION.**

Fidelity is entitled to injunctive relief from this Court pending FINRA arbitration.  The United States Circuit Courts of Appeal for the First through the Eleventh Circuits all have held that securities firms are entitled to immediate injunctive relief pending the outcome in arbitration to preserve status quo.  *See Salvano*, 999 F.2d at 214; *Teradyne Inc. v. Mostek Corp.*, 797 F.2d 43 (1st Cir. 1986); *Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990); *Ortho Pharm. Corp. v. Amgen Inc.*, 887 F.2d 460 (3d Cir. 1989); *Bradley*, 756 F.2d at 1053-54; *Ruscitto*, 777 F. Supp. 1349; *Performance Unlimited v. Questar Pub.*, 52 F.3d 1373 (6th Cir. 1995); *Peabody Coalsales v. Tampa Electric*, 36 F.3d 46 (8th Cir. 1994); *PMS Dist. Co. v. Huber*, 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch v. Dutton*, 844 F.2d 726 (10th Cir. 1988); *Merrill Lynch v. Hegarty*, 808 F. Supp 1555, 1561 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993) (per curiam).

In *Bradley*, the Fourth Circuit expressly held:

> The arbitration process would be a ***hollow formality*** where the arbitral award when rendered could not return the parties to the status quo ante.... When an account executive breaches his employment contract by soliciting his former employer's customers, ***a non-solicitation clause requires immediate application to have any effect.  An injunction even a few days after solicitation has begun is unsatisfactory*** because the damage is done.  ***The customers cannot be "unsolicited."***  It may be impossible for the arbitration award to return the parties to the status quo ante because the prevailing parties' damages may be too speculative.

756 F.2d at 1053-1054 (emphasis added).

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

1    In fact, under FINRA Rule 13804, Fidelity is *required* to seek and obtain

2    immediate injunctive relief in a court of competent jurisdiction before an expedited

3    FINRA arbitration is permitted to proceed.  Thus, Fidelity's election to seek

4    immediate injunctive relief from both the FINRA and this Court is not only consistent,

5    but is required under the FINRA Code of Arbitration Procedure.

6    **VII.    THERE IS NO NEED FOR A BOND.**

7    Although a bond is required under Federal Rule of Civil Procedure 65(c), the

8    district court has wide discretion as to the amount.  *Walczak v. EPL Prolong, Inc.*, 198

9    F.3d 725, 733 (9th Cir. 1999).  In fact, "[t]he district court may dispense with the

10   filing of a bond when it concludes there is no realistic likelihood of harm to the

11   defendant from enjoining his or her conduct."  *Jorgensen v. Cassiday*, 320 F.3d 906,

12   919 (9th Cir. 2003); *see also McNamara*, 2011 WL 2117546 at *8 (citing *Jorgensen*)

13   (declining to issue bond requested by defendants); *Pyro Spectaculars*, 861 F.Supp.2d

14   at 1098 (same).

15   Here, Fidelity has demonstrated an overwhelming likelihood of success on its

16   claims and has made a clear showing of ongoing and irreparable harm.  The requested

17   injunctive relief will not impede or prevent Heimbach from conducting business.

18   Rather, the requested injunctive relief will narrowly enjoin Heimbach from continuing

19   to unlawfully solicit Fidelity's customers and retaining Fidelity's confidential and

20   trade secret customer information.  Accordingly, Fidelity respectfully requests that the

21   Court either dispense with the bond requirement or require a nominal bond.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

[footer]

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FIDELITY'S *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Locke Lord LLP
300 South Grand Avenue, Suite 2600
Los Angeles, CA 90071

## CONCLUSION

For all the foregoing reasons, Fidelity respectfully requests that the Court grant Fidelity's Application and issue the requested injunctive relief in accordance with Fidelity's [Proposed] Order submitted concurrently herewith.

Dated: April 10, 2013

Respectfully Submitted,

LOCKE LORD LLP

By: ______________________

Nina Huerta
Attorney for Plaintiff
FIDELITY BROKERAGE SERVICES LLC