1  MARVIN BARTEL #107531
   mbartel@bartelevans.com
2  MORGAN R. EVANS #198278
   mevans@bartelevans.com
3  BARTEL & EVANS LLP
   4695 MacArthur Court, Suite 1550
4  Newport Beach, CA 92660
   Telephone: (949) 752.3700
5  Facsimile:  (949) 752.3701

6  Attorneys for Defendant
   DEAN HEIMBACH

7

8                    UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11

12  FIDELITY BROKERAGE                )  Case No. CV 13-0573 AG (ANx)
    SERVICES LLC,                     )  Assigned for all Purposes to the Hon.
13                                    )  Andrew Guilford
                         Plaintiff,   )
14                                    )  **DEFENDANT DEAN**
        vs.                           )  **HEIMBACH'S OPPOSITION TO**
15                                    )  **PLAINTIFF'S *EX PARTE***
    DEAN HEIMBACH,                    )  **APPLICATION FOR ORDER TO**
16                                    )  **SHOW CAUSE RE**
                         Defendant.   )  **PRELIMINARY INJUNCTION**
17                                    )
                                      )  (Declarations of Dean Heimbach and
18                                    )  Robert Wrona; and Evidentiary
                                      )  Objections to Declarations of Michael
19                                    )  MacDonald, Linda Park, Leslie
                                      )  Blickenstaff, and Eric Bonner, Filed
20                                    )  Concurrently Herewith)
                                      )
21                                    )  Date: April 29, 2013
                                      )  Time: 10:00 a.m.
22                                    )  Courtroom: 10D
                                      )
23                                    )

24

25       Defendant DEAN HEIMBACH ("Mr. Heimbach") submits his opposition

26  to Plaintiff FIDELITY BROKERAGE SERVICES LLC's ("Fidelity") ex parte

27  application for an order to show cause re: preliminary injunction.

28

## TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ...................... 1

II.   STATEMENT OF PERTINENT FACTS ................................................. 4

    A.   Mr. Heimbach's employment with Fidelity .................................. 4

    B.   Mr. Heimbach is approached by and accepts employment with Capstone .......................................................... 6

         1.   Mr. Heimbach's departure from Fidelity ........................... 6

         2.   Capstone's mailing of a general announcement of Mr. Hiembach's new employment ........................................................................ 6

         3.   Mr. Heimbach signs the affidavit attesting to the fact that he had destroyed the handwritten client list and returned any document created from that list ....................................................................... 8

         4.   Mr. Heimbach's meeting with Mr. Wrona ....................... 9

         5.   The apparent set-up of Mr. Heimbach ............................ 10

III.  LEGAL ARGUMENT ......................................................................... 13

    A.   Test for Preliminary Injunction ............................................... 13

    B.   Fidelity is not likely to succeed on the merits ........................... 14

         1.   Fidelity neglects to make any mention of the *Edwards* Decision ............................................................. 14

         2.   Mr. Heimbach did not solicit fidelity customers ........................................................................ 16

         3.   Fidelity presents no evidence that Heimbach has solicited any Fidelity Customers, much less use trade secret information to do so ......................... 16

         4.   Fidelity has not shown a probability of success on its breach of contract claim ......................................... 18

         5.   Fidelity's breach of loyalty claim .................................... 21

         6.   Fidelity offers no evidence of damages ........................... 22

    C.   Irreparable Injury ..................................................................... 22

    D.   Balance of hardships ................................................................. 23

TABLE OF CONTENTS – TABLE OF AUTHORITIES

1      E.    Public interest ................................................................................. 24

2      F.    Heimbach's objections to Fidelity's Proposed Order; it is Overbroad and Asks the Court for Mandatory
3            Relief ........................................................................... 24

4  IV.    CONCLUSION ..................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS – TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

### Federal Cases

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir.2011) ............................................................................... 13

*Applied Materials, Inc. v. Advanced Micro-Fabrication Equipment (Shanghai) Corp.*, 630 F.Supp.2d 1084 (N.D.Cal.2009) .......................................................................... 21

*Bank of America, N.A. v. Lee*, 2008 WL 4351348 (C.D.Cal.) ....................... 15

*Caribbean Marine Serv. Co., Inc. v. Baldridge*, 844 F.2d 668 (9th Cir.1988) .................................................................................... 22

*Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399 (9th Cir.1993) ................ 14

*Fidelity Brokerage Services, LLC v. McNamara*, 2011 WL 2117546 (S.D.Cal.) ........................................................................ 18

*Fields v. QSP, Inc.*, 2012 WL 2049528 (C.D.Cal.) ........................................ 15

*Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389 (9th Cir.1984) .................... 7

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F.Supp.2d 1122 (E.D.Cal. 2008) ............................... 21, 22

*Hoffman v. Citibank (S.D.), N.A.*, 546 F.3d 1078 (9th Cir.2008) .................... 19

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ........................... 19

*MAI Sys. Corp. v. Peak Computer Corp.*, 911 F.2d 511 (9thCir. 1993) .................................................................................... 21

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ........................................... 13, 14

*Merrill Lynch v. Chung*, 2001 WL 283083 (C.D.Cal.) ................................... 17

*Merrill Lynch v. Garcia*, 127 F.Supp.2d 1305 (C.D.Cal.2000) ..................... 18

*Merrill Lynch v. Salvano*, 999 F.2d 211 (7thCir.1993) ................................. 16

*Nelson v. Nat'l Aeronautics and Space Admin.*, 530 F.3d 865 (9th Cir.2008) .................................................................................... 22

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir.1991) ............................................... 22

*Ruiz v. Affinity Logistics, Corp.*, 667 F.3d 1618 (9th Cir. 2012) .................... 19

*Sampson v. Murray*, 415 U.S. 61 (1974) ....................................................... 22

*Scotts Co. v. United Industries Corp.*, 315 F.3d 264 (4th Cir.2002) .................................................................................... 23

1    *Siegel v. Le Pore,* 234 F.3d 1163 (11th Cir.2000) ............................................ 22

2    *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716 (9th Cir.1999).............................. 22

3    *Stockdale v. Hartley,* 2010 WL 3583339 (C.D.Cal.) ...................................... 11

4    *Stormans, Inc. v. Selecky,* 586 F.3d 1109 (9th Cir.2009) ............................... 24

5    *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 807 (2008) .................... 13

6

7                                <u>State Cases</u>

8    *Aetna Bldg. Maintenance Co., Inc. v. West,* 39 Cal.2d 198 (1952) ................. 16

9    *American Credit Indemnity Co. v. Sacks,* 213 Cal.App.3d 622
10        (1989).......................................................................................................... 16

11    *Applera Corp. v. MP Biomedicals, LLC,* 173 Cal.App.4th 769
        (2009).......................................................................................................... 19

12    *Dowell v. Biosense Webster, Inc.,* 179 Cal.App.4th 564 (2009) .............. 15, 20

13    *D'sa v. Playhut, Inc.,* 85 Cal.App.4th 927 (2000) ..................................... 19, 20

14    *Edwards v. Arthur Andersen LLP,* 44 Cal.4th 937 (2008) ......................*passim*

15    *Hilb Rogal & Hamilton Ins. Svcs. v. Robb,* 33 Cal.App.4th 1812
16        (1995).......................................................................................................... 16

17    *Hong Que, Inc. v. Mui LUU,* 150 Cal.App.4th 410 (2007)............................. 21

18    *KGB, Inc. v. Giannoulas,* 104 Cal.App.3d 844 (980) ..................................... 19

19    *Kolani v. Gluska,* 64 Cal.App.4th 402 (1998) ............................................... 21

20    *Metro Traffic Control, Inc. v. Shadow Traffic Network,* 22
       Cal.App.4th 853 (1994) ............................................................................ 20

21    *Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459 (1992)........................ 19

22    *People v. Ayers,* 125 Cal.App.4th 988 (2008) ................................................ 11

23

24

25

26

27

28

1

## Statutes and Regulations

2  California Business & Professions Code, §16600 ..................................... 15, 19

3  California Civil Code, §3426 ............................................................... 14

4

5

## Other Authorities

6  Led Zeppelin, *Houses of the Holy*, Atlantic, 1973 ........................................... 25

7  Restatement (Second) of Conflict of Laws § 187 ........................................... 19

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      INTRODUCTION AND SUMMARY OF ARGUMENT.

Fidelity's tome is long on law but short on reliable, admissible evidence. Fidelity concedes that it was aware back in January 2013 that in December 2012 Mr. Heimbach's new employer, Capstone Affluent Strategies ("Capstone") mailed an announcement of his new affiliation to certain Fidelity customers. Thus, that four-month old act cannot serve as the basis for the granting of the extraordinary relief sought here.

The single other piece of purported "evidence" of alleged wrongdoing by Mr. Heimbach in the past four months is that approximately one month ago, on March 13, 2013, a Fidelity customer allegedly called Fidelity to report that Mr. Heimbach appeared at his residence. At the meeting Mr. Heimbach purportedly provided to the customer documents which contained both the customer's personal information and his Fidelity account details. This customer reportedly called the "Chairman's Line" at Fidelity, a line that is known to and reserved only for Fidelity employees, is not published outside of Fidelity, and exists for the purpose of permitting employees to make anonymous complaints within the company without fear of retribution.[1] To protect the anonymity of employees, calls to this internal line apparently are not recorded.[2] Customers, on the other hand, ordinarily are directed to call a customer service line, a line that records Fidelity's interaction with the customer.[3]

With vast resources at its disposal, Fidelity neglected to invest the time to: (1) investigate why or how a customer gained access to the Chairman's Line, (2) explore which Fidelity employee may have provided the customer with

---

[1] *See*, Declaration of Michael MacDonald, "MacDonald Decl.", filed in support of Fidelity's Application, at ¶2.
[2] If such calls are recorded, no transcription of that call was provided by Fidelity to the Court.
[3] *See*, Declaration of Dean Heimbach, "Heimbach Decl.", filed concurrently herewith, at ¶3.

1

1    access, or (3) or interview Fidelity employee, Kevin Goodman, who allegedly

2    had learned this same information in a meeting with the alleged caller.[4]

3         The depth of Fidelity's investigation consisted of Mr. Bronner, a "Senior

4    Internal Investigator", reviewing Mr. Heimbach's Fidelity client list of 411

5    individuals and concluding that only 1 client on that list fit the description of the

6    caller, i.e. a customer whose first name was "Bob" and whose spouse's first

7    name was "Barbara". That client is Mr. Bob Wrona.[5]  Armed with this

8    information, one would safely assume the next step in the investigation, before

9    expending the thousands of dollars of Fidelity's funds in filing this action and

10   summoning the Court's valuable time and resources, would be to place a call to

11   Mr. Wrona to confirm that Mr. Wrona made such a telephone call and that the

12   information provided in that telephone call was accurate.  Although it had

13   almost a month to do so, Fidelity didn't make that call to ask those questions.

14   Instead, a month after the March 13 call and after contacting Mr. Wrona under a

15   subterfuge, Fidelity decided to invest its resources instead by instituting this

16   legal action against Mr. Heimbach.  It filed an ex parte application for a

17   temporary restraining order, supported by a 37-page brief and multiple

18   supporting declarations, claiming that Mr. Heimbach has trade secret

19

20   _____

21   [4] *See*, Exhibit 1, attached to the Declarations of Michael MacDonald and Eric Bronner, both
     filed with the Court by Fidelity, which purports to contain Mr. MacDonald's
22   contemporaneous notes of his conversation with the Fidelity customer.  Per Mr. MacDonald's
     notes, the customer had recently met with his account executive, which Mr. MacDonald
23   allegedly determined to be Kevin Goodman, who was told this same information by the
     customer. (MacDonald Decl., at Exhibit 1, page 3.) Mr. Goodman recommended that the
24   customer report this event to someone at Fidelity.  Absent from Fidelity's papers is any
     indication that anyone at Fidelity interviewed Mr. Goodman to see if he had such a meeting
25   with a customer.  More importantly, if such a meeting occurred, did Fidelity pull up the
     Siebel notes to see if any notes existed memorializing the communication between Mr.
26   Goodman and the customer?  From all appearances, Fidelity did none of the above.
     [5] Based on the redacted information in Fidelity's application and his conversations with
27   Fidelity's outside counsel, Jennifer Kenedy, Esq. before the action was filed, Mr. Heimbach
     deduced that the customer who purportedly made a call to the Chairman's Line was Mr. Bob
28   Wrona. (Heimbach Decl., ¶14.)

2

1  information in his possession and demanding that he respond to these serious

2  accusations within a very limited time frame.

3      Based on the information provided by Fidelity's outside counsel, and

4  based on his review of the redacted declarations of Messrs. MacDonald and

5  Bronner, Mr. Heimbach determined that the alleged customer call came from

6  Mr. Bob Wrona.  (Heimbach Decl., ¶14.) Unlike Fidelity, Mr. Heimbach was

7  not reluctant to make a telephone call to Mr. Wrona to ask him if he made the

8  call attributed to him by Fidelity.  Mr. Wrona confirmed that: (i) he made no

9  such call to Fidelity, (ii) the events described in that call did not happen, and

10  (iii) he would agree to provide a declaration to that effect.[6]   Thus, based on the

11  fact that only Fidelity employees would have access to and be aware of the

12  existence of the Chairman's Line, the most reasonable inference is that Mr.

13  Heimbach was the victim of a deception, most likely perpetrated by a current or

14  former Fidelity employee.

15      In addition to placing all of its eggs in the basket of an event which did

16  not occur, Fidelity's application omits the following critical facts to support its

17  request for such extraordinary relief:

18      1.      The identification of a single customer that it has lost and that Mr.

19  Heimbach took with him to his next employer, Capstone.   Mr. Heimbach

20  provided account services to 411 customers at Fidelity; Fidelity does not

21  identify a single one that it has lost.  Other than its incorrect allegations

22  regarding Mr. Wrona, Fidelity does not even identify a single customer among

23  the 411 that Mr. Heimbach has even *solicited*.

24      2.      The results of the forensic examination conducted by Fidelity of

25  Mr. Heimbach's computer which must have confirmed that Mr. Heimbach

26

27  _____

[6] Mr. Wrona's Declaration is filed concurrently herewith.

28

1  neither downloaded any Fidelity account information to an external hard drive

2  or USB drive nor forwarded any Fidelity information to any outside computer.

3      3.    Any reliable, admissible evidence that Mr. Heimbach presently is

4  in possession of any Fidelity information, trade secret or otherwise.

5      There is neither a factual nor a legal basis for the issuance of a

6  preliminary injunction against Mr. Heimbach.  Fidelity not only cannot establish

7  a likelihood of success on its claims, it makes no showing of any (i) imminent

8  threat of future harm or (ii) damage, much less irreparable injury.  The motion

9  for a preliminary injunction should be denied in its entirety.

10  II.    <u>STATEMENT OF PERTINENT FACTS.</u>

11      A.    <u>Mr. Heimbach's employment with Fidelity.</u>

12      Mr. Heimbach began his employment with Fidelity as an investment

13  representative in Fidelity's Orange County, California office beginning in or

14  about June 2010.  (Heimbach Decl., ¶2.) In early 2011 he was promoted to an

15  account executive.  (*Id.*)  As an account executive at Fidelity he provided

16  services to 411 individuals.  (*Id.*) Additionally, Mr. Heimbach also would field

17  incoming calls to assist Fidelity customers, whether they were customers for

18  whom he had primary responsibility, i.e. whether he was the customer's

19  assigned account executive or if they were customers for whom he did not have

20  primary responsibility.  (*Id.*) When fielding these calls, Mr. Heimbach would

21  access the client information on the system at Fidelity.  When taking these calls

22  on occasion Mr. Heimbach may not always add Siebel notes for each call that

23  he took to assist a customer. (*Id.*)

24      During Mr. Heimbach's employment with Fidelity his direct supervisor

25  was Ms. Linda Park.  (*Id.* at ¶4.)  His job performance was contingent on certain

26  metrics, such as telephone calls, client scores, etc.  (*Id.*) During one of his

27  performance reviews, Mr. Heimbach was instructed by Ms. Park to increase the

28  volume of telephone calls to clients.  (*Id.*)  The increase in telephone calls

4

1   would theoretically increase Mr. Heimbach's contact rate, which would increase

2   his client scores, which would be noted in his performance reviews.  (*Id.*)  In

3   response to Ms. Park's recommendation, Mr. Heimbach intentionally increased

4   his rate of telephone calls to clients.  In order to improve his call rate, Mr.

5   Heimbach would have to access the client's telephone number and contact

6   information in the system.  (*Id.*)  Additionally, throughout the day Mr.

7   Heimbach may go back to access client information to confirm whether he had

8   inserted the proper Siebel notes and activity stamps that were measured by

9   Fidelity for the purposes of his performance evaluation.  (*Id.*)

10         In its moving papers, Fidelity claims that Mr. Heimbach's "look ups" of

11   client information on average was approximately 28 per day and in the 90 days

12   preceding his departure he exceeded that average on 11 occasions (Declaration

13   of Linda Park, "Park Decl." at ¶17.)  Ms. Park claims that for many of these

14   "look ups" there are no corresponding Siebel notes and concludes this evidences

15   Mr. Heimbach's use of this information for an improper purpose, i.e. to take the

16   information to a competitor.  (Park Decl., at ¶¶18-19.)  As noted above,

17   however, Mr. Heimbach's increased look ups was at the express instruction of

18   Ms. Park.  And, if Mr. Heimbach went back to check that a Siebel note or

19   activity stamp had been made for a prior call, he would not enter another entry

20   on that occasion.[7]

21         Additionally, as discussed in more detail below, the single occasion

22   where Fidelity claims that Mr. Heimbach made any use of this purported

23   confidential information was in his meeting with Mr. Wrona – and Mr. Wrona

24   has confirmed that Fidelity's third-hand account of that meeting is incorrect.

25         Finally, glaringly absent from Ms. Park's declaration is the result of

26   ─────────────

27   [7] Fidelity fails to indicate whether it searched Mr. Heimbach's records for any time prior to
     the 90 days before his departure to determine if his activity and volume of "look ups" was at
     or near the same levels on the 11 occasions it notes in Ms. Park's declaration.

28

5

1  Fidelity's forensic examination of Mr. Heimbach's computer.  This examination

2  must have disclosed that there was no downloading by Mr. Heimbach of any

3  customer information onto any external hardware device and there was no

4  forwarding of any customer information to an outside computer.  If Fidelity

5  contends that it did not perform a forensic examination of Mr. Heimbach's

6  computer and therefore it has no such evidence to present to the Court, this is

7  again representative of Fidelity's decision to invest in litigation instead of an

8  investigation.  Mr. Heimbach suspects that such a forensic examination was

9  conducted and revealed that Mr. Heimbach did not act improperly.

10     B.     Mr. Heimbach is approached by and accepts employment with

11            Capstone.

12            1.     Mr. Heimbach's departure from Fidelity.

13     In mid-November 2012 Mr. Heimbach was approached by Capstone with

14  respect to prospective employment.  (Heimbach Decl., ¶5.) Mr. Heimbach

15  accepted that employment in December 2012 and resigned from Fidelity on

16  December 13, 2012. (*Id.*) Capstone is affiliated with LPL Financial ("LPL").

17  (*Id.*) When resigning from Fidelity, at Capstone's request, Mr. Heimbach made

18  a handwritten list of 89 of the 411 customers for which he was account

19  executive.  (*Id.*) The handwritten list contained customer names and addresses

20  only.  (*Id.*) The names were not the customers with the highest volume of

21  business with Fidelity.  (*Id.*) Instead, they were the customers with whom Mr.

22  Heimbach thought he had established a good relationship.  (*Id.*)

23            2.     Capstone's mailing of a general announcement of Mr.

24                   Heimbach's new employment.

25     In late December 2012 Capstone mailed a general announcement to these

26  89 individuals, informing them of Mr. Heimbach's new affiliation. (*Id.*, ¶6.)[8]

27  _____

28  [8] A copy of that general announcement letter is attached as Exhibit 5 to the Declaration of
                                                                    (continued...)

1   Upon learning of these letters, Fidelity apparently instructed its outside counsel

2   to communicate with Peter Gillies, Esq., an attorney affiliated with LPL.

3   (Declaration of Leslie Blickenstaff in support of Fidelity's Application, at ¶9.)[9]

4   Ms. Blickenstaff then attests that Mr. Gillies told *us* that Mr. Heimbach had

5   memorized the names of the customers with whom he worked at Fidelity,

6   looked up their contact information on the internet, and then used that

7   information to send letters to those customers. (Emphasis Supplied.) (*Id.*)

8        Four points.  First, while Mr. Heimbach is aware that the Court, when

9   ruling on Fidelity's motion, can consider and give some weight to hearsay,[10]

10   Mr. Heimbach is not aware of any case law that permits the admission of "triple

11   hearsay."[11]  Here, Fidelity has Ms. Blickenstaff attesting to an alleged statement

12   that was made by Mr. Heimbach to Mr. Gillies, which was then relayed by Mr.

13   Gillies to Fidelity's outside counsel, who then reported it back to Ms.

14   Blickenstaff.[12]  This is not reliable evidence.

15        Second, Mr. Heimbach did not authorize Mr. Gillies to waive any

16   privilege with respect to the attorney-client privileged communications he had

17   with Mr. Gillies.  (Heimbach Decl., ¶7.)  Mr. Heimbach therefore objects and

18   asks the Court to disregard the purported statements made by Mr. Gillies, to the

19

20   (...continued)
     Linda Park, filed in support of Fidelity's Application.

21   [9] In her declaration, Ms. Blickenstaff claims that she learned from Fidelity customers that
     they were being contacted by Mr. Heimbach.  (Blickenstaff Decl., ¶4.) However, in that same

22   paragraph Ms. Blickenstaff qualifies that assertion by conceding that these customers had
     received letters from Mr. Heimbach. (*Id.*)  Thus, the only evidence of purported solicitation

23   by Mr. Heimbach is the mailing of the general announcement of his new affiliation with
     Capstone and his contact and meeting with Mr. Wrona.

24   [10] *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984).
     [11] In a separate filing Mr. Heimbach has submitted his objections to certain of the evidence in

25   the declarations filed by Fidelity in support of its application.
     [12] Such a transmission of information reminds one of the "telephone" game played by

26   children in which one child whispers a message to another, which is passed through a line of
     children until the last player announces the message to the entire group. Errors typically

27   accumulate in the retellings, so the statement announced by the last player differs
     significantly from the one uttered by the first.

28

1   extent the Court intends to give any weight to the multiple hearsay statements

2   contained in Ms. Blickenstaff's declaration.

3        Third, without waiving the attorney-client privilege, Mr. Heimbach made

4   no such statements to Mr. Gillies.  Any information he would have supplied to

5   Mr. Gillies would have been consistent with his declaration filed concurrently

6   herewith – that he made a handwritten list of 89 names and addresses at the

7   request of and for the purposes of Capstone sending out a general

8   announcement of his new affiliation.  (Heimbach Decl. ¶10.)

9        Fourth and finally, if this fact (that Mr. Heimbach had committed all the

10  customer names to memory) was important to Fidelity, then it had ample

11  opportunity to include that fact in the affidavit that it drafted, revised, and Mr.

12  Heimbach voluntarily signed in January 2013.  The affidavit signed by Mr.

13  Heimbach contains no such representation.  (Heimbach Decl. ¶11; a copy of the

14  January 24, 2013 affidavit is attached to the Heimbach Decl. as Exhibit 3.)

15            3.     Mr. Heimbach signs the affidavit attesting to the fact that he

16                   had destroyed the handwritten client list and returned any

17                   document created from that list.

18       In January 2013 Mr. Heimbach was contacted by Mr. Gillies.  (Heimbach

19  Decl., ¶8.) Mr. Heimbach understood Mr. Gillies to be acting as his counsel in

20  his communications with him.  (Id.)  Mr. Heimbach was provided with and

21  asked to sign an affidavit. (Id.; a copy of the draft of the affidavit is attached as

22  Exhibit 2 to the Heimbach Decl.)  Upon review of the draft affidavit, Mr.

23  Heimbach requested that one correction be made.  The original affidavit, which

24  Mr. Heimbach understood was drafted by Fidelity, provided that Mr. Heimbach

25  had not provided any customer information or documents to either LPL or

26  Capstone.  (Exhibit 2 at ¶3.)  Mr. Heimbach requested that the paragraph be

27  revised to state that in connection with Capstone's mailing of the announcement

28  of new affiliation Capstone had access to the customer information that Mr.

1  Heimbach was returning to Fidelity.  (*Id.* at ¶9.)  The paragraph was modified

2  by Fidelity per Mr. Heimbach's request.  Mr. Heimbach then signed and

3  returned the affidavit.  (*Id.* at ¶9; Exhibit 3)

4      Upon signing the affidavit Mr. Heimbach returned the document that

5  contained the client's names and addresses that was used for the purposes of the

6  mailing of the general announcement by Capstone.  (*Id.* at ¶12.)  Per the

7  affidavit, Mr. Heimbach returned this document to Ms. Blickenstaff.  Ms.

8  Blickenstaff concedes that the list contained only the names and addresses of 89

9  Fidelity customers.  (Blickenstaff Decl., ¶10.)[13]

10     After returning the list to Ms. Blickenstaff, Mr. Heimbach was not in

11  possession of any Fidelity information.  The statements contained in paragraph

12  1 of the affidavit were true and correct when Mr. Heimbach signed the affidavit

13  and have remained true and correct from that date through the present.  As noted

14  above, nowhere in the affidavit is there any statement or suggestion that Mr.

15  Heimbach had created from memory the names on the list he returned to Ms.

16  Blickenstaff.

17     As conceded by Fidelity, given the representations and statements made

18  in the affidavit and the return of the list, it considered the matter closed.

19  (Blickenstaff Decl., ¶10.)  And so did Mr. Heimbach.

20         4.     Mr. Heimbach's meeting with Mr. Wrona.

21     After the mailing of the general announcement, Mr. Heimbach received a

22  telephone call from one of the individuals to whom the mailing was sent, Bob

23  Wrona.  (Heimbach Decl., ¶13; Declaration of Robert Wrona, hereafter "Wrona

24  Decl., ¶4)  In early January, at the request and invitation of Mr. Wrona, Mr.

25  Heimbach met with Mr. Wrona at his residence.  (Wrona Decl., ¶4)  At no time

26  during that meeting or any other meeting with Mr. Wrona did Mr. Heimbach

27  [13] In her declaration, Ms. Park attests that the list also contained clients' telephone numbers.
   (Park Decl., ¶13.)  That statement is false.

28

9

1   supply, provide or represent to Mr. Wrona that he had pre-printed Fidelity forms

2   or any other Fidelity information relating to Mr. Wrona's accounts at Fidelity.

3   (Wrona Decl., ¶4)

4          5.      The apparent set-up of Mr. Heimbach.

5          The hearsay evidence that Fidelity claims supports its contention that Mr.

6   Heimbach still has in his possession Fidelity customer account information is an

7   anonymous telephone call made to a Fidelity employee, Michael MacDonald,

8   on a "Chairman's Line" at Fidelity.  This line is not known outside of Fidelity

9   and is reserved for employees who wish to remain anonymous when making

10  complaints or inquiries about ethical issues within Fidelity.  (MacDonald Decl.,

11  ¶2.)  Mr. MacDonald claims he took contemporaneous notes of this

12  conversation, which are attached as Exhibit 1 to his declaration.  His notes

13  purportedly reflect the hearsay statements of the customer who is identified with

14  a first name "B" and a last name "W" in both the Macdonald Declaration and

15  the Eric Bronner Declaration.  This conversation occurred on March 13, 2013.

16  (See, MacDonald Decl., Exhibit 1)  Mr. MacDonald's notes purport to reflect

17  the customer's statements that Mr. Heimbach had appeared at his residence with

18  pre-printed forms containing the customer's personal and Fidelity account

19  information.  (Id.)

20         Mr. MacDonald then presented this information to Mr. Bronner who was

21  assigned to investigate this customer call.  It would appear that the extent of Mr.

22  Bronner's investigation was to examine Mr. Heimbach's list of 411 customers

23  that he serviced at Fidelity.  According to Mr. Bronner, that list reflected but

24  one customer of Fidelity with the first name that began with the letter "R" or

25  "B", whose spouse's name also began with the letter "B", with a last name that

26  began with the letter "W". After purportedly identifying the customer who had

27  contacted Fidelity, neither Mr. Bronner nor any other Fidelity employee did

28  anything to follow up on that telephone call.  No one contacted the Fidelity

1   customer to confirm what was said in the conversation with Mr. MacDonald or

2   indeed that the customer had even made the telephone call.[14] While Mr.

3   MacDonald's notes indicate that the customer had reported these same events to

4   Fidelity account executive, Kevin Goodman, there is no indication in the

5   declaration of either Mr. Macdonald or Mr. Bronner that either one contacted

6   Mr. Goodman to confirm that fact or confirm the identity of the customer.

7       Most importantly, according to the declaration submitted by the senior

8   investigator, Mr. Bronner, his scorched-earth investigation unearthed the

9   identity of the caller.  His review of the list of customers assigned to Mr.

10  Heimbach at the time of his resignation indicated that only one customer named

11  "Robert/Bob" whose wife's name is "Barbara" was a customer to whom Mr.

12  Heimbach was assigned and that customer was "BW".  (Bronner Decl., ¶6)

13  After unearthing the identity of the customer, Mr. Bronner never called the

14  customer to confirm that he made the call.  While Fidelity may claim that it did

15  not want to invade the privacy of the customer to inquire about this information;

16  that excuse is belied by the fact that Ms. Park did call Mr. Wrona after the

17  March 13 incident.  In that call, in an apparent subterfuge, she told Mr. Wrona

18  that someone had attempted to access his Fidelity account.  She did not ask him

19  whether he had made a call to Fidelity regarding Mr. Heimbach.  (Wrona Decl.,

20  ¶6.) If she had, she would have been told by Mr. Wrona that he did not make

21

22  _____

    [14] The only evidence of that conversation is the purported memo created by Mr. MacDonald

23  after the call.  While that memo may fall under the business record exception to the hearsay
    rule, the statements allegedly made by the customer on that call as reflected in that document

24  are hearsay.  The hearsay statements of the customer are not sanitized by their inclusion in a
    business record created by Fidelity – they remain hearsay.  *See, Stockdale v. Hartley*, 2010

25  WL 3583339 (C.D.Cal.) (While the ER form may be within the business records exception,
    the hearsay statements of the paramedics or those communicating with them are not.); *People*

26  *v. Ayers*, 125 Cal.App.4th 988, 994 (2008) (The AAFV forms contained multiple layers of
    hearsay. "When multiple hearsay is offered, an exception for *each* level of hearsay must be

27  found in order for the evidence to be admissible. (Citation omitted.)").

28

1   such a call and the information provided in the call regarding Mr. Heimbach
2   was false. (Wrona Decl., ¶¶6, 7.)
3        In his declaration, Mr. Wrona sets forth in detail the circumstances of his
4   communications and meetings with Mr. Heimbach after Mr. Heimbach's
5   departure from Fidelity.  Mr. Wrona confirms that Mr. Heimbach never showed
6   him, intimated, or led him to believe he was in possession of any of Mr.
7   Wrona's account information or account details at Fidelity.  (Wrona Decl. ¶8.)
8   Mr. Wrona establishes that he was the one who initiated the contact with Mr.
9   Heimbach after he received an announcement of new employment from
10  Capstone.  Mr. Heimbach never presented any pre-printed forms to Mr. Wrona
11  that contains any Fidelity account information of Mr. Wrona or anyone else.
12  (*Id.*)
13       Mr. Wrona categorically denies placing any telephone call to Fidelity to
14  complain about Mr. Heimbach.  Mr. Wrona categorically denies making any of
15  the statements that are attributed to him by Fidelity in <u>Exhibit 1</u> attached to the
16  declarations of Messrs. McDonald and Bronner.  Mr. Wrona further attests that
17  if Fidelity would have contacted him to ask about those statements (and no one
18  did), he would have denied making such a telephone call and would have
19  informed Fidelity that the statements attributed to him in <u>Exhibit 1</u> were false
20  with respect to any of his interactions with Mr. Heimbach.  (*Id.* at ¶8.)
21       Additionally, Mr. Wrona attests to the fact that he received a telephone
22  call from Ms. Park, one of Fidelity's declarants, who was apparently on a
23  fishing expedition.  In that conversation Ms. Park told Mr. Wrona that someone
24  named "Bob" had attempted to access his account electronically.  (*Id.* at ¶6)
25  Notably, nowhere in her declaration does Ms. Park reference this
26  communication.
27       Once this purported "evidence" is removed from Fidelity's motion,
28  Fidelity has not one iota of evidence in support of its motion for a preliminary

1   injunction that Mr. Heimbach is in possession of any customer information of

2   Fidelity, that he is making any improper use of this information, or that he has

3   done anything improper in the 3 months preceding this hearing.

4   III.     LEGAL ARGUMENT.

5         A.     Test for Preliminary Injunction.

6         A preliminary injunction "should not be granted unless the movant, by a

7   clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520

8   U.S. 968, 972 (1997) (per curiam) (citation omitted). Under the "serious

9   questions" version of the test, a preliminary injunction is appropriate when a

10   plaintiff demonstrates that "serious questions going to the merits were raised

11   and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for*

12   *the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir.2011) (citation

13   omitted).  This approach requires that the elements of the preliminary injunction

14   test be balanced, so that a stronger showing of one element may offset a weaker

15   showing of another. " '[S]erious questions going to the merits' and a balance of

16   hardships that tips sharply towards the plaintiff can support issuance of a

17   preliminary injunction, so long as the plaintiff also shows that there is a

18   likelihood of irreparable injury and that the injunction is in the public interest."

19   *Id.*

20        To obtain preliminary injunctive relief, Fidelity must demonstrate that: 1) it

21   is likely to succeed on the merits of such a claim; 2) it will likely to suffer

22   irreparable harm in the absence of preliminary relief; 3) the balance of equities

23   tips in its favor; and 4) an injunction is in the public interest. *Winter v. Natural*

24   *Res. Def. Council, Inc.,* 555 U.S. 807 (2008)

25        A Ninth Circuit panel has found that post-*Winter,* this circuit's sliding scale

26   approach or "serious questions" test survives "when applied as part of the four-

27   element *Winter* test." *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127,

28   1131–32 (9th Cir.2011). "That is, 'serious questions going to the merits' and a

13

1    balance of hardships that tips sharply towards the plaintiff can support issuance

2    of a preliminary injunction, so long as the plaintiff also shows that there is a

3    likelihood of irreparable injury and that the injunction is in the public interest."

4    *Id.* at 1132, 1135.

5        Because a preliminary injunction is an extraordinary remedy, the movant

6    must carry its burden of persuasion by a "clear showing." *Mazurek v.*

7    *Armstrong,* 520 U.S. 968, 972 (1997). Mandatory injunctions are "subject to

8    heightened scrutiny and should not be issued unless the facts and law *clearly*

9    *favor* the moving party." *Dahl v. HEM Pharmaceuticals Corp.,* 7 F.3d 1399,

10   1403 (9th Cir.1993) (Emphasis Supplied.).

11       B.    Fidelity is not likely to succeed on the merits.

12       Fidelity asserts three claims in its complaint against Mr. Heimbach -

13   violations of the California Trade Secrets Act, Cal. Civ. Code, §3426 et seq.,

14   breach of contract, and breach of duty of loyalty.  Each claim is premised on the

15   allegation that Mr. Heimbach used trade secret information to solicit Fidelity

16   customers.  As noted above, Mr. Heimbach has successfully rebutted that

17   allegation.  Therefore, as set forth below, Fidelity's factual showing is

18   insufficient to meet the required standard that it is likely to succeed on the

19   merits of any of its 3 claims.

20       1.    Fidelity neglects to make any mention of the *Edwards*

21             Decision.

22       In its 37-page brief Fidelity not once makes reference to *Edwards v.*

23   *Arthur Andersen LLP*, 44 Cal.4th 937 (2008) ("*Edwards*"), the California

24   Supreme Court decision which changed the legal landscape when it comes to

25   evaluating the legality of non-competition and non-solicitation covenants in

26   employment agreements in California.  In *Edwards* the California Supreme

27

28

14

1    Court found that under Cal. Bus. & Prof. Code, §16600,[15] a non-compete

2    provision which restrains an individual's ability to engage his or her profession

3    is void, even if the restraint is arguably "reasonable." (*Edwards*, 44 Cal.4th at

4    949-950.) The *Edwards* case articulates the broad principles and policy

5    considerations behind §16600.  The challenged provisions not only included an

6    eighteen-month covenant not to compete, they also included a provision

7    precluding the *solicitation* of the company's *customers* for a period of one year.

8    *Edwards*, 44 Cal.4th at 948.  The California Supreme Court held both

9    provisions were void. *Id.*

10       As they must, federal courts have followed this holding in rejecting non-

11    solicitation covenants in employment agreements in California. *Bank of*

12    *America, N.A. v. Lee*, 2008 WL 4351348 (C.D.Cal.) at *5; *Fields v. QSP, Inc.*,

13    2012 WL 2049528 (C.D.Cal.) at *9 ("Here, paragraphs 1(a)-(e) and 3(b) of the

14    employment agreement seek to prohibit plaintiff from contacting or soliciting

15    any fundraising organizations within a proscribed geographical territory or any

16    QSP employees for one year.  Such restrictions are per se unlawful under

17    California law regardless of the reasonableness of the covenant, because "an

18    employer cannot by contract restrain a former employee from engaging in his or

19    her profession," "[T]he right to announce a new affiliation, even to trade secret

20    clients of a former employer, is basic to an individual's right to engage in fair

21    competition." *Id.*)

22       Following *Edwards*, covenants not to solicit a former employer's

23    customers are treated as covenants not to compete. *Dowell v. Biosense Webster,*

24    *Inc.*, 179 Cal.App.4th 564, 577 (2009) [invalidating a covenant not to solicit

25

26

27 [15] "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code, §16600.

28

1   customers with whom employees had contact during their last 12 months of

2   employment for 18 months after employment].)

3              2.      Mr. Heimbach did not solicit Fidelity customers.

4        While the announcement of new employment by Mr. Heimbach's new

5   employer, Capstone, did not violate either his employment agreement or

6   California law, the fact is that that announcement occurred in December 2012,

7   and Fidelity became aware of that announcement in January 2013, more than

8   three months ago.  The announcement of new employment cannot form the

9   basis of the issuance of injunctive relief more than three months later.

10  Moreover, the event has already occurred; there is nothing to enjoin.

11       Also, an employee is legally entitled to announce his new employment.

12  *American Credit Indemnity Co. v. Sacks,* 213 Cal.App.3d 622, 636 (1989); *Hilb*

13  *Rogal & Hamilton Ins. Svcs. v. Robb,* 33 Cal.App.4th 1812, 1821 (1995); *Aetna*

14  *Bldg. Maintenance Co., Inc. v. West,* 39 Cal.2d 198, 203 (1952)) ("Willingness

15  to discuss business upon the invitation of another party [does not] constitute

16  solicitation on the part of the invitee.")

17              3.      Fidelity presents no evidence that Heimbach has solicited

18                      any Fidelity Customers, much less used trade secret

19                      information to do so.

20       It has been four months since Heimbach's departure for Fidelity.  In these

21  four months Fidelity has uncovered no evidence, hearsay or otherwise, that

22  Heimbach is soliciting or has solicited any Fidelity customers and done

23  anything more than have Capstone send out a general announcement of his new

24  affiliation in January 2013.  This critical fact distinguishes this case from each

25  and every case cited by Fidelity in its application.[16]

26  _____

27  [16] *See,* e.g., *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir.1993) (Salvano and Coon
    took various documents and information pertaining to Merrill Lynch's clients and used that
28  information to solicit Merrill Lynch customers.)

1       Fidelity bases its entire legal argument on the proposition that California

2  courts routinely grant injunctions barring employees from using their former

3  employers' trade secret customer information[17] to solicit the customers of their

4  former employers. (Fidelity Application, at p. 15)  Not surprisingly Fidelity then

5  cites to a litany of cases that stand for that proposition. What Fidelity does not

6  and cannot establish here is any solicitation by Mr. Heimbach.  Without any

7  evidence of solicitation, none of the cases cited by Fidelity supports its request

8  for injunctive relief.

9       For example, in *Merrill Lynch v. Chung*, 2001 WL 283083 at \*2

10  (C.D.Cal.), Defendants did not deny that they personally telephoned Merrill

11  Lynch customers to engage them in conversations concerning the products and

12  services offered by their new employer and to otherwise solicit Merrill Lynch

13  customers to transfer their accounts to them at Smith Barney.

14       In *Fidelity Brokerage Services, LLC v. McNamara*, 2011 WL 2117546

15  (S.D.Cal.), the former Fidelity employee was charged with not only sending out

16  a formal announcement of his new employment but also with soliciting

17  numerous clients via telephone seeking to transfer their business to Merrill

18  Lynch.  Indeed, Fidelity estimated that approximately $5 million of client assets

19  previously managed by Fidelity have been moved to Merrill Lynch since the

20  former employee, McNamara, had left Fidelity three months prior.  *McNamara*,

21  2011 WL at \*2.  Here, there is no evidence of any solicitation, telephonic or

22  otherwise, by Mr. Heimbach, and no evidence of any loss of client assets by

23  Fidelity.

24       Importantly, in *McNamara*, Fidelity conceded that "California law

25  permits McNamara to notify Fidelity clients that he has moved to Merrill

---

26  [17] For the purposes of opposing Fidelity's motion, Mr. Heimbach will not challenge whether
Fidelity's customer account information qualifies as a trade secret.  Based on the fact that Mr.

27  Heimbach has no such information in his possession and has not used said information, its
trade secret status is irrelevant.

28

1   Lynch. (citation omitted.) McNamara may also discuss business with the clients,

2   if invited to do so. (citation omitted.)." *McNamara*, 2011 WL at *3.  That is

3   precisely what Mr. Heimbach did here when responding to a few calls from

4   individuals who received the announcement.  (Heimbach Decl., ¶13)

5       Similarly, in *Merrill Lynch v. Garcia*, 127 F.Supp.2d 1305

6   (C.D.Cal.2000), the court found that Merrill Lynch was entitled to injunctive

7   relief based on its showing that the former employees, through their new

8   employer, Smith Barney, contacted Merrill Lynch customers and provided them

9   with documentation to transfer their accounts.  *Garcia*, 127 F.Supp.2d at 1306.

10  Again however when so finding the court recognized that:

11      "It is important to note that California courts have stressed that there is a
12      distinction between "solicitation[1]—which is actionable—from
        announcing a job change—which is not: 'Merely informing customers of
13      one's former employer of a change of employment, without more, is not
        solicitation." *Hilb v. Robb*, 33 Cal.App.4th 1812, 1821 (1995) (quoting
14      *Aetna Bldg. Maintenance Co. v. West*, 39 Cal.2d 198, 204 (1952)); *see*
15      *also Merrill Lynch Pierce Fenner & Smith v. Breeden*, No. C99–20793
16      (N.D.Cal.1999). In addition, the court in *American Credit Indemnity Co.*
        *v. Sacks*, 213 Cal.App.3d 622, 636 (1989) recognized that "basic to an
17      individual's right to engage in fair competition" is the right to announce
18      one's new affiliation. *Id.* at 636."

19

20      The general announcement mailed by Capstone met the above standard.

21  It did nothing more than notify the recipients of Mr. Heimbach's new affiliation.

22  It did not solicit the customer's business.[18]

23          4.      Fidelity cannot show a probability of success on its breach of

24                  contract claim.

25      Fidelity contends that Mr. Heimbach violated the non-solicitation and

26  ---
    [18] A sample of the general announcement letter mailed by Capstone is attached as Exhibit 5 to
    the Park Declaration in support of Fidelity's Application.  Fidelity makes no argument that
27  either the contents of the letter or its mailing was in any way improper or in violation of the
    law.
28

1  non-disclosure provisions found in §6 of his employment agreement.  Mr.

2  Heimbach's employment agreement provides, and in its application Fidelity

3  argues that Massachusetts law applies.  Nevertheless, under the conflicts of law

4  test applied by California courts, California law should be found to apply to the

5  contract.  Mr. Heimbach at all times was a California resident, was employed in

6  Fidelity's Orange County office, and signed the contract here in California.

7         In diversity cases, federal courts apply the choice-of-law rules of the

8  forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941).

9         California's choice of law framework is set forth in Restatement (Second)

10  of Conflicts of Laws, §187(2) and in *Nedlloyd Lines B.V. v. Superior Court,* 3

11  Cal.4th 459 (1992). "California courts apply the parties' choice of law unless

12  the analytical approach articulated in § 187(2) of the Restatement (Second) of

13  Conflict of Laws ("187(2)") dictates a different result." *Hoffman v. Citibank*

14  *(S.D.), N.A.,* 546 F.3d 1078, 1082 (9th Cir.2008) (citation omitted). A California

15  court may apply the choice-of-law provision in a contract so long as the

16  application of the chosen law would not violate public policy.  *Nedlloyd*, 3

17  Cal.4th at 466; *Applera Corp. v. MP Biomedicals, LLC*, 173 Cal.App.4th 769,

18  790 (2009)

19         The district court should consider (1) whether applying Massachusetts's

20  law "is contrary to a *fundamental* policy of California." (quoting *Nedlloyd*)

21  (Emphasis in Original). *Ruiz v. Affinity Logistics, Corp.,* 667 F.3d 1618, 1623

22  (9th Cir. 2012).

23         While non-solicitation covenants may be enforceable in Massachusetts,

24  following *Edwards*, they are no longer in California.  Moreover, there exists a

25  clear legislative declaration of public policy against covenants not to compete.

26  Cal. Bus. & Prof. Code, §16600 represents a strong public policy of this state.

27  *KGB, Inc. v. Giannoulas*, 104 Cal.App.3d 844, 848 (1980); *D'sa v. Playhut,*

28

1   *Inc.*, 85 Cal.App.4th 927, 933 (2000).[19]

2        At all times Mr. Heimbach was a resident of California and was

3   employed in Fidelity's Orange County office.  (Heimbach Decl., ¶2)  He signed

4   the employment agreement in California.  (*Id.*) All of the acts alleged both in

5   Fidelity's complaint and application occurred in this state.  Accordingly the

6   Court should apply California, not Massachusetts, law to the contract.  Under

7   California law, and following *Edwards* and its progeny, the non-solicitation

8   covenant in Section 6 of the agreement between Fidelity and Mr. Heimbach is

9   unenforceable.

10       Similarly, because the non-disclosure provision found in Section 6 of the

11   employment agreement is overbroad, is not limited to the protection of trade

12   secrets, and is contained in the same section of Mr. Heimbach's employment

13   agreement that prohibits any types of solicitation for one year post-employment

14   (Heimbach Decl., at Exhibit 1, §6),[20] that provision also will be found to be

15   unenforceable under California law.  *Dowell v. Biosense Webster, Inc.*, 179

16   Cal.App.4th 564, 577 (2009) (Noncompete and nonsolicitation clauses in the

17

18   _____

19   [19] "California courts have consistently declared [section 16600] an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice." (*Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22

20   Cal.App.4th 853, 859 (1994).)
     [20] Section 6 provides as follows: "Non-solicitation.  In consideration of the training and/or

21   education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information.  Employee

22   agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any

23   Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or

24   induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies

25   or otherwise cease the relationship with the Fidelity Companies.  During the same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or

26   any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee

27   otherwise learned during the course of Employee's employment with the Fidelity Companies..."

28

1    agreements not narrowly tailored or carefully limited to the protection of trade

2    secrets but are broadly worded as to restrain competition.).[21]

3         Hence, Fidelity has not established a reasonable probability of prevailing

4    on its breach of contract claim.[22]

5              5.    Fidelity's breach of loyalty claim.

6         In support of its argument that it will prevail on its breach of loyalty

7    claim, Fidelity cites to two cases, *Hong Que, Inc. v. Mui LUU*, 150 Cal.App.4th

8    410, 416-417 (2007) and *Hanger Prosthetics & Orthotics, Inc. v. Capstone*

9    *Orthopedic, Inc.*, 556 F.Supp.2d 1122 (E.D.Cal. 2008).  In *Hong Que*, however

10   the court found that the plaintiff-employer had a made of showing of prevailing

11   on the merits of its breach of loyalty claim because the defendants, when

12   competing against their plaintiff-employer, were still managing agents of the

13   plaintiff-employer.  As managing agents they continued to owe a duty of loyalty

14   which included a duty to refrain from competing with their employer.  *Hong*

15   *Que*, 150 Cal.App.4th at 416-17.

16        Similarly, in *Hanger*, the court denied a summary judgment motion by

17   the defendants-employees based on the fact that they acquired confidential

18   information while employed at Hanger with the purpose of using it to solicit

19   clients for Capstone, and *held back business at Hanger the month before their*

20

21   _____

22   [21] *See also, Applied Materials, Inc. v. Advanced Micro-Fabrication Equipment (Shanghai)*
     *Corp.*, 630 F.Supp.2d 1084, 1091 (N.D.Cal.2009) (In this case, the Court has found that the

23   Assignment Clause operates as an unlawful non-compete provision. As such, it is void under
     California law.  *Kolani v. Gluska*, 64 Cal.App.4th 402, 407 (1998).  The Court is not

24   permitted to apply any narrowing construction to limit the application of the Assignment
     Clause to confidential information or to inventions conceived by former Applied employees

25   during their tenure at Applied. *See Id.*))
     [22] Fidelity cites to *MAI Sys. Corp. v. Peak Computer Corp.*, 911 F.2d 511, 522 (9thCir. 1993)

26   for the proposition that the Ninth Circuit has affirmed the granting of a preliminary injunction
     to prohibit violation of a non-solicitation agreement. (Fidelity Application at p. 28)  However,

27   *MAI Sys. Corp.* was decided long before *Edwards* and following *Edwards* likely is no longer
     good law.

28

1    *departure* in anticipation of working for Capstone.  (Emphasis Supplied.)

2    *Hanger*, 556 F.Supp.2d at 1142.

3        Here, Mr. Heimbach's alleged acts were committed after he no longer

4    was employed by Fidelity.  At the time of those acts, he owed no duty of loyalty

5    to Fidelity.  If any duty of loyalty was owed, it may have been to his then-

6    employer, Capstone.

7            6.    <u>Fidelity offers no evidence of damages.</u>

8        It is axiomatic that damage is a necessary element of each of Fidelity's

9    claims.  Yet in its brief Fidelity introduces no evidence of any damage it has

10   suffered.  It points to no customers that it has lost to Mr. Heimbach due to his

11   purported improper conduct.

12       C.    <u>Irreparable Injury.</u>

13       A preliminary injunction "may only be granted when the moving party

14   has demonstrated a significant threat of irreparable injury." *Simula, Inc. v.*

15   *Autoliv, Inc.,* 175 F.3d 716, 725 (9th Cir.1999). "The possibility that adequate

16   compensatory or other corrective relief will be available at a later date, in the

17   ordinary course of litigation, weighs heavily against a claim of irreparable

18   harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974). Establishing a risk of future

19   harm is insufficient, the harm must be imminent. *Caribbean Marine Serv. Co.,*

20   *Inc. v. Baldridge,* 844 F.2d 668, 674 (9th Cir.1988). Even if plaintiffs establish

21   success on the merits, "the absence of a substantial likelihood of irreparable

22   injury would, standing alone, make preliminary injunctive relief improper."

23   *Siegel v. Le Pore,* 234 F.3d 1163, 1176 (11th Cir.2000). Monetary injury is not

24   normally considered to be irreparable. *See, Nelson v. Nat'l Aeronautics and*

25   *Space Admin.,* 530 F.3d 865, 881 (9th Cir.2008)  Ordinarily, economic injury is

26   not considered irreparable, because monetary damages are available as an

27   adequate remedy. *Rent–A–Center, Inc. v. Canyon Television & Appliance*

28   *Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991).

22

1    Based on the lack of evidence, Fidelity cannot establish a serious,

2    significant threat of irreparable injury.  The sole incident on which Fidelity

3    relies never happened.  This is clearly established by the declarations from both

4    participants at the meeting, Messrs. Wrona and Heimbach.  No other evidence is

5    presented by Fidelity that Mr. Heimbach presently possesses or is using any

6    Fidelity customer information.

7         D.    <u>Balance of hardships.</u>

8         Before an injunction may issue, the court must weigh the hardship

9    injunctive relief may cause defendants against the threatened harm to plaintiffs.

10   "[T]he real issue in this regard is the degree of harm that will be suffered by the

11   plaintiff or the defendant if the injunction is *improperly* granted or denied."

12   *Scotts Co. v. United Industries Corp.,* 315 F.3d 264, 284 (4th Cir.2002).

13        Fidelity bases its argument that the balance of hardships tips sharply in its

14   favor on the fact that Mr. Heimbach is soliciting its customers, its loss of

15   customers, and the loss of customer goodwill because of Fidelity's customers'

16   perceptions that Fidelity does not protect the customers' financial information.

17   (Fidelity Application, at pp. 30-32)

18        Mr. Heimbach believes that he has rebutted factually any argument that

19   he is soliciting any Fidelity customers and that he is in possession of any

20   Fidelity customer information.  In its moving papers, Fidelity fails to provide

21   any evidence of any loss of customers to either Mr. Heimbach or Capstone.  Mr.

22   Heimbach has also rebutted any suggestion that any Fidelity customers have

23   expressed concern because Mr. Heimbach has in his possession the customers'

24   Fidelity account information and has displayed that information to customers.

25        Finally, Mr. Heimbach has been terminated and is no longer employed by

26   Capstone (Heimbach Decl., ¶15) He currently is unemployed. (*Id.*)  Notably,

27   Fidelity made the intentional and tactical decision not to name Capstone as a

28   defendant in this litigation.  Mr. Heimbach has been left to fend for himself in

23

1   defending against these non-meritorious but serious claims.  Mr. Heimbach will

2   continue to suffer hardship to the extent that this Court grants extraordinary

3   relief when he has committed none of the acts alleged in Fidelity's complaint

4   and its moving papers.

5         E.      Public interest.

6         When an injunction will impact non-parties and has the potential to

7   impact the public, the public interest is relevant.  *See, Stormans, Inc. v. Selecky,*

8   586 F.3d 1109, 1139 (9th Cir.2009). By contrast, "[w]hen the reach of an

9   injunction is narrow, limited only to the parties, and has no impact on non-

10  parties, the public interest will be at most a neutral factor in the analysis rather

11  than one that favors granting or denying the preliminary injunction." *Id.* at

12  1138–39 (quoting *Bernhardt v. L.A. Cnty.,* 339 F.3d 920, 931 (9th Cir.2003))

13  (internal quotations marks and brackets omitted).

14        There can be no public interest in granting extraordinary relief to a former

15  employer based upon the limited if not non-existent evidentiary showing here.

16  This is particularly true when the employer can point to no evidence in the last 3

17  months that suggests that the former employee, Mr. Heimbach, has done

18  anything wrong.  Employers should not be permitted to use their vastly superior

19  resources to seek an unfair advantage over an employee who has done nothing

20  wrong but lacks the resources of Fidelity to fight this battle.  Fidelity should not

21  be rewarded for failing to invest in a competent investigation and instead

22  pursuing this action against Mr. Heimbach.

23        F.      Heimbach's Objections to Fidelity's Proposed Order; it is

24                Overbroad, and Asks the Court for Mandatory Relief.

25        In its proposed order, the relief sought by Fidelity includes an instruction

26  that Mr. Heimbach return all materials pertaining to Fidelity customers and file

27  a declaration attesting that he has returned all such materials.  *See,* Proposed

28  Order, at §A. (iii) and (iv).  As noted above, Ms. Heimbach has already attested

1    twice that he returned all such materials, first by way of his January 24, 2013

2    affidavit (Heimbach Decl., <u>Exhibit 3</u>) and second, in his declaration filed in this

3    matter.  Simply put, he has nothing to return.  He could say it a third time but

4    the Song Remains the Same.[23]  Moreover, Fidelity's minimal evidentiary

5    showing does not warrant the Court's issuance of such mandatory relief.

6           With respect to Sections A.(i) and (ii) of the Proposed Order, those

7    provisions are overbroad and violate California law to the extent they would bar

8    Mr. Heimbach from soliciting any customer who Mr. Heimbach served or

9    whose name became known to Mr. Heimbach during his Fidelity employ.  As

10    noted above, non-solicitation covenants are unenforceable in California post-

11    *Edwards*.

12    IV.    <u>CONCLUSION.</u>

13           Mr. Heimbach has been wrongly accused.  He deserves an order from this

14    Court that exonerates him.

15    Dated:  April 22, 2013          BARTEL & EVANS LLP

16

17                               By: _____/s/ Marvin Bartel_____

18                                  Marvin Bartel

19                      Attorneys for Defendant Dean Heimbach

20

21

22

23

24

25

26

27

—————————————

[23] Led Zeppelin, *Houses of the Holy*, Atlantic, 1973.

28