1   MARVIN BARTEL #107531
mbartel@bartelevans.com
2   MORGAN R. EVANS #198278
mevans@bartelevans.com
3   BARTEL & EVANS LLP
4695 MacArthur Court, Suite 1550
4   Newport Beach, CA 92660
Telephone: (949) 752.3700
5   Facsimile: (949) 752.3701

6   Attorneys for Defendant
DEAN HEIMBACH

7

8

9           UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

11

| | |
|---|---|
| 12   FIDELITY BROKERAGE SERVICES LLC, | Case No. CV 13-0573 AG (ANx) Assigned for all Purposes to the Hon. Andrew Guilford |
| 13                 Plaintiff, | |
| 14 | **DECLARATION OF DEAN HEIMBACH IN SUPPORT OF OPPOSITION TO PLAINTIFF'S** |
| 15    vs. | ***EX PARTE* APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| 16   DEAN HEIMBACH, | |
|                Defendant. | |
| 17 | (Opposition to Plaintiff's Ex Parte Application for OSC re Preliminary |
| 18 | Injunction; Declaration Robert Wrona; and Evidentiary Objections to |
| 19 | Declarations of Michael MacDonald, Linda Park, Leslie Blickenstaff, and |
| 20 | Eric Bronner, Filed Concurrently Herewith) |
| 21 | |
| 22 | Date: April 29, 2013 Time: 10:00 a.m. |
| 23 | Courtroom: 10D |
| 24 | |
| 25 | |

26

27

28

1    I, DEAN HEIMBACH, hereby declare as follows:

2       1.       I am a named defendant in this action and currently reside in the

3   County of Orange, State of California.  The following facts are known to me

4   personally and if called upon as a witness I could and would competently testify

5   thereto.

6       2.       I began employment with Fidelity Brokerage Services, LLC

7   ("Fidelity") as an investment representative in Fidelity's Orange County,

8   California office beginning in or about June 2010.  Upon commencing

9   employment I signed an employment agreement, a copy of which is attached

10  hereto as Exhibit 1.  When I signed the document I was in California.  During

11  my entire employment at Fidelity I worked in Fidelity's Orange County office.

12  In early 2011 I was promoted to an account executive.  As an account executive

13  at Fidelity I provided services to approximately 400 individuals.  Additionally, I

14  also would field incoming calls to assist Fidelity customers, whether they were

15  customers for whom I had primary responsibility, i.e. whether I was the

16  customer's assigned account executive, or if they were customers for whom I

17  did not have primary responsibility.  When fielding these calls, I would access

18  the client information on the system at Fidelity.  When taking these calls on

19  occasion I would not always enter Siebel notes for each call that I took to assist

20  a customer.

21      3.       During my employment with Fidelity, when customers placed calls

22  to Fidelity to complain, these calls ordinarily would be routed or transferred to a

23  customer service line.  It is my understanding that customers' calls to that line

24  were recorded by Fidelity.

25      4.       During my employment with Fidelity my direct supervisor was Ms.

26  Linda Park.  My job performance was contingent on certain metrics, such as

27  telephone calls, client scores, etc.  During one of my performance reviews, Ms.

28  Park instructed me to try to increase the volume of telephone calls to clients.

2

1   The increase in telephone calls would theoretically increase my contact rate,

2   which would increase my client scores, which would be noted in my

3   performance review.  In response to Ms. Park's recommendation, I intentionally

4   increased my rate of telephone calls to clients.  In order to improve my call rate,

5   I would have to access the client's telephone number and contact information in

6   the system.  Additionally, throughout the day I may go back to access client's

7   information to confirm whether I had inserted the proper Siebel notes and

8   activity stamps that were measured by Fidelity for the purposes of my

9   performance evaluation.  When doing so, I would not add more notes or activity

10  stamps for those clients.

11      5.      In mid-November 2012, I was approached by Capstone Affluent

12  Strategies ("Capstone") with respect to prospective employment.  I accepted

13  that employment in December 2012 and resigned from Fidelity on December

14  13, 2012.  When resigning from Fidelity, at Capstone's request, I made a

15  handwritten list of 89 of the 411 customers for which I was account executive.

16  The handwritten list included customer names and addresses only.  The names

17  were not the customers with the highest volume of business with Fidelity.

18  Instead, they were the customers with whom I thought I had established a good

19  relationship.  Other than my handwritten notes of the names and addresses for

20  the 89 accounts, I took from Fidelity no other client information regarding the

21  411 customers.

22      6.      In late December 2012 Capstone mailed a general announcement

23  to these 89 individuals, informing them of my new affiliation.  A copy of that

24  general announcement letter is attached as Exhibit 5 to the Declaration of Linda

25  Park filed by Fidelity in support of its application.

26      7.      After Fidelity learned of the mailing of these letters, I was

27  contacted in January 2013 by Peter Gillies, Esq., an attorney affiliated with LPL

28  Financial, LLC.  I did not authorize Mr. Gillies to waive any privilege with

3

1    respect to the attorney-client privileged communications I had with Mr. Gillies.

2         8.    I understood Mr. Gillies to be acting as my counsel in his

3    communications with Fidelity.  I was provided with and asked to sign an

4    affidavit.   It is my understanding that Fidelity had drafted this affidavit for me

5    to sign.  (A true and correct copy of the draft of the affidavit is attached hereto

6    as Exhibit 2.)

7         9.    Upon my review of the draft affidavit, I requested that one

8    correction be made.  The original affidavit, which I understood was drafted by

9    Fidelity, provided that I had not provided any customer information or

10   documents to either LPL or Capstone.  I requested that the paragraph be revised

11   to state that in connection with Capstone's mailing of the announcement of new

12   affiliation Capstone had access to the customer information that I was returning

13   to Fidelity.  The paragraph was modified per my request.  I then signed the

14   affidavit. (A true and correct copy of the January 24, 2013 affidavit that I signed

15   is attached hereto as Exhibit 3.)

16        10.    Without waiving the attorney-client privilege, I made no statements

17   to Mr. Gillies that I had created from memory the names and addresses on the

18   mailing list used by Capstone.  I would have informed Mr. Gillies that I had

19   made a handwritten list of 89 names and addresses at the request of and for the

20   purposes of Capstone sending out a general announcement of my new

21   affiliation.

22        11.    If this fact (that I had committed all the names to memory) was

23   important to Fidelity, then it had the opportunity to include that fact in the

24   affidavit that it drafted and that I voluntarily signed in January 2013.  The

25   affidavit that was signed by me contains no such representation.

26        12.    Upon signing the affidavit I returned to Fidelity the signed affidavit

27   and the document that contained the clients' names and addresses that was used

28   for the purposes of the mailing of the general announcement.  I destroyed and

1   kept no copies of the document that I returned to Fidelity.  Before signing my
2   affidavit I had already destroyed the handwritten list of names and addresses
3   that I had used to create the mailing list for Capstone.  The document that I
4   returned to Fidelity was created from that handwritten document.  Once I
5   returned that document to Fidelity I had no Fidelity account information in my
6   possession.  This has been true from the date that I signed the affidavit until the
7   present.

8       13.     After the mailing of the general announcement, I received
9   telephone calls from a few of the individuals who had received the mailing.
10  One of the individuals to whom the mailing was sent was Mr. Bob Wrona.  In
11  early January at the request and invitation of Mr. Wrona, I met with Mr. Wrona
12  at his residence.  At no time during that meeting, in any other meeting, or in any
13  conversation with Mr. Wrona did I supply, provide or represent to Mr. Wrona
14  that I had pre-printed Fidelity forms or any other Fidelity information in my
15  possession relating to Mr. Wrona's accounts at Fidelity.

16      14.     Prior to the filing of this lawsuit I received a number of telephone
17  calls from Jennifer Kenedy, Esq., outside counsel for Fidelity.  These telephone
18  calls are referenced in her declaration filed with the Court.  Based on those
19  conversations with Ms. Kenedy and my review of the redacted information in
20  the Declarations of Michael MacDonald and Eric Bronner filed by Fidelity, I
21  was able to deduce that the alleged customer who Fidelity claimed had made a
22  telephone call to the Chairman's Line was Bob Wrona.  After deducing that
23  information, I placed a telephone call to Mr. Wrona.  He denied making any
24  such call to Fidelity and denied that I had shown or provided him any of his
25  Fidelity account information.  He also agreed to provide a declaration to that
26  effect on my behalf.

27      15.     Capstone terminated my employment on March 28, 2013.  I am no
28  longer employed by Capstone.  I am presently unemployed.

1        I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3        Executed this 22nd day of April 2013.

4                                          _____
                                           DEAN HEIMBACH
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6